921 So.2d 58 (2006)
Leon L. GIORGIO, Jr.
v.
ALLIANCE OPERATING CORPORATION, Gulfstream Resources, Inc., Burlington Resources, et al., Chevron USA, Inc., Superior Oilfield Services, Inc., State of Louisiana Through Its Department of Natural Resources, Lloyds Underwriters at Lloyds, et al.
Jacques A. Sanborn
v.
Alliance Operating Corporation, Gulfstream Resources, Inc., Burlington Resources, et al., Chevron USA, Inc., Superior Oilfield Services, Inc., State of Louisiana, Through Its Department of Natural Resources, Lloyds Underwriters at Lloyds, et al.
No. 2005-C-0002.
Supreme Court of Louisiana.
January 19, 2006.
Rehearing Denied March 10, 2006.
*62 Charles C. Foti, Jr., atty. gen., Gustave A. Manthey, Jr., special asst. atty. gen., William S. Culver, Jr., asst. atty. gen., for Applicant.
Dysart & Tabary, Daniel L. Dysart, Paul A. Tabary, III, Chalmette, Jacques A. Sanborn, Leonce J. Malus, IV, Arabi, David L. Colvin & Associates, David L. Colvin, Gretna, L. Gerome Smith, for Respondent.
KNOLL, Justice.[*]
This civil case addresses the legal question of whether the State of Louisiana is liable for an allision[1] that occurred when a fishing boat allided with an unlit, unmarked "orphaned" oilfield production platform in the Breton Sound area of the Gulf of Mexico. The plaintiffs, Leon L. Giorgio and Jacques A. Sanborn, sued the State through its Department of Natural Resources for property damage and injuries the men sustained when their boat allided with the unlit structure, alleging the State's failure to light the platform in question was the proximate cause of the allision. The district court found the State 100% liable for the harm occasioned by the structure. The court of appeal affirmed. We granted this writ to examine the correctness vel non of the lower courts' determination of the State's liability. Giorgio v. Alliance Operating Corp., 05-0002 (La.4/29/05), 901 So.2d 1043. For the following reasons, we find in the absence of either ownership or custody of the structure, the State had no duty to light the structure and, therefore, no liability for the harm occasioned by the unlit structure. We reverse the lower courts' determination of liability, dismissing plaintiffs' claims against the State in their entirety.

FACTS AND PROCEDURAL HISTORY
On March 14, 1998, around three o'clock in the afternoon, the JO-LE, a thirty-eight foot Bertram Sport Fisherman,[2] owned by the 38BLLC,[3] left the Chalmette Gulf Outlet Marina and headed on a southerly course for the waters of Breton Sound via the Mississippi River Gulf Outlet [hereinafter "MRGO"]. Abroad the vessel was one of the members of the 38BLLC, Leon Giorgio, his good friend, Jacques Sanborn, and Sanborn's fourteen-year-old son, Brett *63 Sanborn. The group's purpose for the trip was pleasure, and their intended course was to travel down the MRGO, across Breton Sound and into Venice where they were to meet up with Giorgio's partner and the following day "go to Cypress Cove Marina and go to the west side of the river... to go tuna fishing."[4]
As they headed east down the MRGO, Giorgio and Sanborn noted the seas were calm, and because it was still daylight and a full moon was expected, they decided around 5:30 p.m. to deviate from their intended course and continue out into the ship channel to fish the south side of Breton Island around Blocks 40-41 for snapper. The record demonstrates the vessel was well-equipped with radar, autopilot, GPS, VHF radio, compass, depth finder, a hailer, and various sea charts. During the trip Giorgio, the captain of the vessel, had his radar and GPS operational and referenced them "during the course of the evening."[5]
After fishing several locations, i.e., rigs and platforms, without success, the group decided to head toward Venice, working their way back to Breton Island on a course that "basically would go off the southwest end of Breton Island because there are buoys that go into Batiste Collete," the entrance into Venice, Louisiana.[6] At trial, Giorgio acknowledged he "could have went directly on a more due west course that would have been a little bit shorter, but ... [he] was going to go more on a little northwesterly course to the island, which [he] was more familiar...."[7] It was Giorgio's intention to work his way toward Venice while keeping open the option to stop at other structures they might see on the way.
The JO-LE was on course toward Breton Island when the vessel crashed into a set of pilings adjacent to a large, unlit[8] oilfield production platform in Block 52 of Breton Sound. At the time of the accident, Giorgio had a visual fix on the lighted Kerr-McGee tower located on Breton Island and had just adjusted the vessel's radar from short range (1/4 to ½ miles) to long range (24 miles)[9] to get a fix on his destination, "to pick up the shoreline to where Batiste Collete was, to see if we were in range of that as of yet."[10] The district court found that immediately prior to the allision, the vessel was traveling about half speed, between ten and fifteen miles per hour, as testified to by Giorgio and corroborated by Jacques Sanborn.
As a result of the allision, Giorgio and Sanborn were seriously injured, and the vessel, which was almost impaled on the pilings on the northeast corner of the platform,[11] was taking on water and sinking. *64 Giorgio sent a "mayday" signal over his VHF radio to which the Massive Runner, a 152-foot crew boat responded. The injured men were rushed to Venice, where they were transported by ambulance to Meadowcrest Hospital for treatment. The JO-LE ultimately sank and was declared a total loss by the marine surveyor assigned by the insurer of the vessel.
The site of the accident was at a structure put on State Lease 8342, granted to the Gulf Oil Corporation [hereinafter "Gulf Oil"] by the State Mineral Board on October 10, 1979. Gulf Oil received a permit from the United States Army Corps of Engineers and the Louisiana State Department of Conservation to drill three wells and erect a production platform. The wells were drilled in 1981, and the platform was installed in 1982 by Chevron U.S.A., Inc., [hereinafter "Chevron"], Gulf Oil's successor in title to the lease. Effective July 1, 1988, the lease was assigned to Alliance Operating Corporation [hereinafter "Alliance"], which in turn sold the lease to Superior Oil Services, Inc., [hereinafter "Superior"] effective August 1, 1992. As of February 1993, the State Mineral Board considered the lease "expired by its terms"[12] and accordingly authorized the release of the lease on December 8, 1993. The release in favor of the State of Louisiana was executed by Superior on April 28, 1994, and recorded on May 3, 1994.
The release provided that Superior release, relinquish, surrender, and forever quitclaim to the State Mineral Board any and all right, title, and interest whatsoever presently owned by Superior in and to the lands covered by State Lease 8342. On January 20, 1995, the lease was declared "orphaned" by the State of Louisiana pursuant to Act 404 of the 1993 Legislature, the "Louisiana Oilfield Site Restoration Law," La.Rev.Stat. 30:80, et seq. In the present case, the site was orphaned based on paperwork, not on inspection or lack of compliance with any State 29-B Compliance Order to plug and abandoned as the files do not contain any such order issued relative to the orphaned status.
Giorgio and Sanborn filed petitions for damages against several defendants that had at one time owned, operated or were otherwise responsible for the abandoned drilling structure with which the plaintiffs allided the JO-LE.[13] All the defendants except the State were dismissed as a result of settlement before trial; trial proceeded against the State only.[14] Trial commenced *65 on August 19, 2002, and after three days of testimony and receiving evidence, the district court took this matter under advisement.
On January 28, 2003, the district court rendered judgment in favor of the plaintiffs and against the State. Finding the State's responsibility for the platform and for the injuries suffered by the plaintiffs to be established by virtue of the release of the original lease and the declaration of the site as orphaned by the State, the district court, relying on Anderson v. Tenneco Oil Company, 01-0295 (La.App. 4 Cir. 5/22/02), 826 So.2d 1143, writ denied, 02-2035 (La.11/1/02), 828 So.2d 585, and Melerine v. State, 00-0162 (La.App. 4 Cir. 11/8/00), 773 So.2d 831, writs denied, 01-0382, 01-0480 (La.4/12/01), 789 So.2d 595, 599,[15] held the State 100% liable for the harm occasioned by the structure.
As authority for the application of state law in the present case, the district court relied on "a long-standing and well-defined body of law which allows the use of state law to supplement federal maritime law when not in an area reserved exclusively to the federal body of law."
The district court awarded Sanborn: $100,000 for past physical pain, suffering, and mental anguish; $125,000 for future physical pain, suffering, mental anguish, and permanent disability; $10,414.72 for past medical expenses; $70,000 for future medical expenses; and $125,000 for property damage. The district court awarded Giorgio: $75,000 for past physical pain, suffering, and mental anguish; $100,000 for future physical pain, suffering, mental anguish, and permanent disability; and $3,851.50 for past medical expenses. In addition, the plaintiffs were awarded legal interest from the date of judicial demand until paid for all past damages awarded, and interest from the date of judgment on all future damages awarded, plus all costs of the proceedings.
On appeal, the Fourth Circuit affirmed the district court's judgment. Giorgio v. Alliance Operating Corp., 03-1832 (La. App. 4 Cir. 11/10/04), 886 So.2d 1283. The court of appeal addressed the State's four assignments of error in turn. First, as to district court's failure to apply general maritime law, the court of appeal concluded there was no election by the district court to apply state law over the general maritime law and, thus, the State failed to show how any principals of state law cited in the district court's reasons for judgment in any way conflicted with the general maritime law. Second, the court of appeal found no manifest error in the district court's allocation of fault as the State failed to show how any violation of the Inland Rules of Navigation was a proximate cause of the accident as the cluster of pilings adjacent to the abandoned unlit structure was the cause in fact of the accident. Third, the court also agreed with the district court that the State had custody of and responsibility for the accident site and the abandoned unlit structure presented an unreasonably dangerous *66 hazard to navigation. Finally, as to the State's challenge to the district court's award of property damage for the total loss of the JO-LE to Sanborn when he had no ownership interest in the vessel, the court found the record clearly established that by virtue of a settlement of Sanborn's personal injury claim against 38BLLC and London Underwriters (the vessel's insurer), and London Underwriters' settlement with Chevron, London Underwriters assigned its property damage rights against the State to Sanborn.
Judge Tobias in his dissent concluded that general maritime law applied to this accident. He further found Shofstahl v. Board of Commissioners of Orleans Levee District, 02-0018 (La.App. 4 Cir. 1/15/03), 841 So.2d 1, writ denied, 03-1387 (La.9/26/03), 854 So.2d 368, rather than Anderson or Melerine, controls the facts of this case and should apply in the instant matter. In Shofstahl the court found the plaintiffs liable under general maritime law for an allision between the plaintiffs' vessel and an unlit pier that appeared on navigational charts. In the present case, the National Oceanic and Atmospheric Administration charts of Breton Sound marked the obstruction which the JO-LE struck. Giorgio had charts abroad the JO-LE, one of which depicted the obstruction. Therefore, Giorgio failed to observe and exercise appropriate caution. Moreover, no duty existed for the State to light the obstruction. Finally, the State was not liable under La.Rev.Stat. 9:2798.1 or La.Rev. Stat. 30:101.8 because as a matter of common sense and law the appearance of the obstruction on an official nautical chart was sufficient to warn those traveling upon navigable water of the obstruction.

LAW AND ANALYSIS
In its application to this Court, the State sets forth two assignments of error. First, the State alleges the lower courts erred in exclusively applying state law under the guise of a "supplement" to general maritime law. Second, the lower courts erred in imposing any liability on the State.[16] We begin with a discussion of the applicable law in the case sub judice, and then examine the issue of duty, which we find dispositive.

Law of the Case

Admiralty Jurisdiction
"Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance." The Plymouth, 70 U.S. (3 Wall.) 20, 36, 18 L.Ed. 125 (1865).[17] Over time this pure locality rule has been expanded, and based on Supreme Court precedent, the current test of admiralty tort jurisdiction requires that an incident (1) occur on navigable waters, i.e., a maritime locality, and (2) have a maritime connection or flavor, i.e., a maritime nexus. See Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), Foremost Ins. Co. v. Richardson, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); Sisson v. Ruby, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990); and Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). *67 This latter inquiry has been bifurcated into two subparts: (a) does the type of incident involved have the potential to disrupt maritime commerce and (b) does the general activity involved bear a substantial relationship to a traditional maritime activity? See Sisson, 497 U.S. at 364-65, 110 S.Ct. 2892; Grubart, 513 U.S. at 534, 115 S.Ct. 1043.
The present case clearly falls within maritime tort jurisdiction. First, the allision occurred on the navigable waters of the United States in the Breton Sound area of the Gulf of Mexico, thus satisfying the maritime locality prong. Second, the allision had a maritime nexus in that (1) the allision of a vessel in the course of navigation with a stationary platform, an acknowledged obstruction to navigation, does have the potential to disrupt maritime commerce and navigation in general; and (2) the general activity, i.e., the navigation of a vessel on navigable waters and the lighting of an obstruction to navigation, bear a substantial relationship to a traditional maritime activity, i.e., navigation.

State Jurisdiction  "Saving to Suitors" Clause
While the United States Constitution grants to federal district courts jurisdiction in all "Cases of admiralty and maritime Jurisdiction," U.S. Const. art. III, § 2, see also 28 U.S.C. § 1333(1), state courts have concurrent jurisdiction by virtue of the "saving to suitors" clause of the Judiciary Act of 1789 as amended. In the present case, the plaintiffs, although their case falls within federal admiralty jurisdiction, brought their case in state court pursuant to the savings to suitors clause, designating their suit as a suit in admiralty or a general maritime claim in their original Petition for Damages: "This is an admiralty and maritime claim brought in accordance with the saving-to-suitors clause, 28 U.S.C. § 1331(1)."[18]

General Maritime Tort Law
"As a general proposition, `[a] maritime claim brought in common law state courts ... is governed by the same principles as govern actions brought in admiralty, i.e., by federal maritime law.'" Green v. Industrial Helicopters, Inc., 593 So.2d 634, 637 (La.1992), cert. denied, 506 U.S. 819, 113 S.Ct. 65, 121 L.Ed.2d 32 (1992). Thus, with admiralty jurisdiction comes the application of substantive admiralty law. See New England Mut. Marine Ins. Co. v. Dunham, 78 U.S. (11 Wall.) 1, 25, 20 L.Ed. 90 (1870).
However, the general maritime law is not a complete or all-inclusive system.
When new situations arise that are not directly governed by legislation or admiralty precedent, federal courts may fashion a rule for decision by a variety of methods. Federal courts may, and often do, look to state statutory law and to precepts of the common law which they "borrow" and apply as the federal admiralty rule. Moreover, federal courts may apply state law, as such, to a case with the admiralty jurisdiction if the occurrence is "maritime but local" and there is no need to fashion a uniform admiralty rule. Finally, federal courts may apply state law and regulations to supplement the general maritime law when there is no conflict between the two systems of law, and the need for uniformity of decision does not bar state action.
Schoenbaum, supra, at § 4-1, pp. 158-59.
"It is well settled that by virtue of the savings clause `a state, "having concurrent *68 jurisdiction, is free to adopt such remedies, and to attach to them such incidents as it sees fit" so long as it does not attempt to make changes in the substantive maritime law.'" Green, 593 So.2d at 637. The United States Supreme Court has made clear that the uniformity principle does not preclude the application of state law in admiralty; rather, the decision whether to apply state law in cases within admiralty jurisdiction must be based upon balancing state and federal interests:
[T]he fact that maritime law is  in a special sense at least ...  federal law and therefore supreme by virtue of Article VI of the Constitution carries with it the implication that wherever a maritime interest is involved, no matter how slight or marginal, it must displace a local interest, no matter how pressing or significant. But the process is surely rather one of accommodation, entirely familiar in many areas of overlapping state and federal concern, or a process somewhat analogous to the normal conflict of laws situation where two sovereignties assert divergent interests in a transaction as to which both have some concern.
Kossick v. United Fruit Co., 365 U.S. 731, 739, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). Therefore, state law may be applied where the state's interest in a matter is greater than the federal interest. Green, 593 So.2d at 638. Further, "[t]his principle, applying the state rule in a matter within the admiralty jurisdiction when the state interest outweighs the federal interest, has been recognized by the U.S. Supreme Court." Id. (citing, Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) (allowed City of Detroit to impose the requirements of its smoke control regulations on vessels coming to the city, even though vessel owners met federal standards); Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941) (allowed state survival action to supplement maritime law); Red Cross Line v. Atlantic Fruit, 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582 (1924) (allowed state court to compel arbitration under arbitration provision of maritime contract reasoning that because it was a valid clause under admiralty law, it was proper to substitute a different and more effective remedy); Cf. Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961) (the U.S. Supreme Court utilized an interest balancing approach but concluded that the need for a uniform rule regarding contracts required allowing the federal rule to prevail)).

Application of General Maritime Tort Law
Because admiralty jurisdiction is established, all the substantive rules and precepts peculiar to the law of the sea become applicable. Pope & Talbot v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143 (1953). Under general maritime law, collision and allision liability is based on fault that caused or contributed to the damage incurred. See The Java, 81 U.S. (14 Wall.) 189, 20 L.Ed. 834 (1871). The concept of "fault" presupposes a standard of correct conduct.
In collision and allision cases, the standard of care against which fault is determined is derived from (1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules governing the movement and management of vessels and other maritime structures; and (3) recognized customs and usages. See Schoenbaum, supra, at § 14-2, p. 90; Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 7-3, 488-89 (2nd ed.1975). Notably, the relevant statutes and regulations include both federal and state or local enactments, subject to the obvious requirement that the *69 state and local laws do not contradict federal law. Gilmore & Black, supra, at § 7-3, p. 488. Moreover, the statutes and regulations must be determined to be applicable, i.e., the plaintiff must be included in the class of persons protected and the harm suffered must be the kind that the statute or rule was designed to prevent. Such a finding will trigger the application of the rule of The Pennsylvania, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873):
The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.
This concept of standard of care is essentially one of duty. The determination thus becomes what standard of care or duty is applicable to the parties at issue in this case and whether the obligated party's actions failed to meet that standard of care. Stated simply, whether the State owed a duty to the plaintiffs under the circumstances herein.
Essential to the allision in this case is the unlit oilfield production platform. The crux of the plaintiffs' case against the State is the State's liability for the unlit structure. As this case arises in admiralty, we first examine whether the State had a duty to light the structure under federal maritime law.

Federal Law
Under the Code of Federal Regulations Title 33, Section 67, the platform at issue as a structure erected in the waters under the jurisdiction of the United States and as a fixed structure for which a Corps of Engineers' permit was issued is required to have obstruction lights to be operated as privately maintained maritime aids to navigation. See 33 C.F.R. § 67, et seq. (1997). 33 C.F.R. § 67-01.1 (1997) specifically provided:
The regulations in this part prescribe the obstruction lights and fog signals to be operated as privately maintained maritime aids to navigation on the artificial islands and structures which are erected on or over the seabed and subsoil of the Outer Continental Shelf and in the waters under the jurisdiction of the United States, for the purpose of exploring for, developing, removing and transporting resources therefrom.
33 C.F.R. § 67.05-1 sets forth the general requirements for lights on such structures and the arrangement of the obstruction lights as private aids to navigation.[19]
*70 These rules requiring lighting of structures as private aids to navigation were enacted to prevent allisions with oilfield platforms, the harm suffered in this case. Moreover, mariners, like the plaintiffs in this case, are the class of persons the rules were intended to protect. Therefore, these federal rules are unquestionably applicable in this case, and the question now becomes what entity was required to provide and maintain obstruction lights on the structure as a private aid to navigation as required under 33 C.F.R. § 67. Simply put, what entity had the duty to light the structure under federal law.
The obligation to light the structure and to maintain the obstruction lights as private aids to navigation apparently falls to the owner. See 33 C.F.R. § 67.40-15 (1997) ("The District Commander may mark, for the protection of marine commerce, any structure whenever the owner thereof has failed suitably to mark the same in accordance with this part ..."). Interestingly, ownership is not specifically defined in this section. However, reading this section as a whole and in conjunction with subpart 66.01 governing private aids to navigation, the concept of ownership as well as liability appears to intertwine with the application and permit process, potentially rendering the permittee the liable party. See Gele v. Chevron Oil Co., 574 F.2d 243, 247 (5th Cir.1978)(owner/permittee of unlit flare pipe liable for failure to mark the structure in violation of 33 C.F.R. § 67.05-1).
In the present case, the record contains copies of two permits applied for by Gulf Oil Corporation to "construct, maintain, operate, and remove structures and appurtenances required for oil, gas, or other mineral exploration, production, storage, and transportation operations in the Gulf of Mexico, portions of blocks 51 and 52, Breton Sound Area," and to "dredge in an area to accommodate a production barge and install and maintain a boat dock, two 3½ and one 6-inch pipelines in the Gulf of Mexico, at central to a point about 16.0 miles northeasterly from Venice, Louisiana, off Plaquemines Parish...." See State's Exhibits 14 and 16 (Department of the Army permits). Moreover, the permits specifically provide for the installation and maintenance of lights and signals on said platform by and at the expense of the permittee. See State's Exhibits 14, p. 4 and 16, p. 4.
Although both the permit and the C.F.R. provide for the transfer of the permit and the ownership of private aids to navigation, see State's Exhibits 14, p. 3 and 16, p. 3[20] and 33 C.F.R. § 66.01-55 (governing *71 the transfer of ownership of private aids to navigation),[21] there is no evidence in the record of a transfer of the permit or the ownership of the private aid to navigation, i.e., the structure operating with the required obstruction lights, as required under the permit and 33 C.F.R. § 66.01-55. Testimony at trial acknowledged there was no reason why Chevron would not have intended to transfer all the permits, but there is no evidence Chevron transferred the permits or the obligation to maintain obstruction lights on the structure as a private aid to navigation. Therefore, without evidence of a transfer, Gulf Oil Corporation and its successor in interest, Chevron, as the permittees, were obligated to light the structure and to maintain obstruction lights on the structure as a private aid to navigation. Failure to light the structure violated a federal statute and breached its prescribed standard of care, potentially invoking the rule of The Pennsylvania.
Notably, we have found no specific duty under federal law that requires the State to light the structure. Therefore, to succeed in their claims, the plaintiffs must establish liability of the State under state law.

State Law
In this case, the plaintiffs allege the State had a duty to light the structure, as owner and custodian of the abandoned structure. The plaintiffs rely upon state law principles to establish the State's liability, namely La. Civ.Code art. 2317, which under a theory of strict liability, prescribes a duty to the owner or person having custody of immovable property to keep such property in a reasonably safe condition, requiring such person to discover any unreasonably dangerous condition on the premises and either correct the condition or warn potential victims of its existence. The plaintiffs further rely on La. Civ.Code art. 493 to establish the State's ownership and custody of the structure which is central to finding liability under art. 2317.
As noted above, the standard of care in maritime collision and allision cases derives from statutory law, both federal *72 and state, provided the latter does not conflict with the former. "As a matter of logic and legally permissible principle, Louisiana may afford a remedy not traditionally found in the maritime law, provided that the remedy neither conflicts with substantive maritime law nor impermissibly interferes with the requirement of uniformity." Green, 593 So.2d at 639. In determining the applicability of state law in a maritime context, the balance of the analysis entails "determining whether there is applicable federal legislation, identifying the `characteristic features of maritime law', and examining the scope of the uniformity requirement." Green, 593 So.2d at 639.
In Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992), this Court held that Louisiana's strict liability provisions of La. Civ.Code art. 2317 applied in a case cognizable in admiralty but brought in a Louisiana state court pursuant to the "saving to suitors" clause of the Judiciary Act of 1789 as amended. Once again, in the present case, the plaintiffs advocate the application of La. Civ.Code art. 2317 to impose liability upon the State as owner and custodian of the structure.
In determining whether La. Civ. Code art. 2317 may apply in this case to supplement the general maritime tort law, this Court must engage in the analysis set forth by the Court in Green. First, this Court must determine whether there is an applicable Congressional pronouncement governing the liability of an owner or custodian of an abandoned, orphaned oilfield platform for injuries sustained by a passenger and captain of a vessel from an allision with the platform on inland waters caused by an unreasonably dangerous condition of the platform premises. Although 33 C.F.R. 67.05 does require obstruction lighting for platforms most logically for the protection of navigators, the statutory provisions do not specifically impose liability on the owner or custodian of the platform obstruction for injuries sustained by mariners resulting from an allision with the platform caused by an unreasonably dangerous condition of the platform premises.
Absent a clearly applicable act of Congress, this Court must next look to the general maritime law to determine if application of article 2317 would materially prejudice the "characteristic features of maritime law." Taking into account that general maritime law distinctly authorizes application of supplementary state law in some situations and specifically to establish the standard of care in allision cases, it is logical to conclude the general maritime law authorizes application of state law under the circumstances of this case. See Green, 593 So.2d at 641.
The third step of the inquiry requires analyzing the scope of the uniformity requirement. Courts have from time to time supplemented general maritime law with state law, such as in cases affecting "the exercise of ... [the state's] police powers or in the provision of an additional maritime tort remedy." Green, 593 So.2d at 642 [citations omitted]. Although where maritime contracts are involved, the federal interest is at its zenith, in many maritime tort cases, the interest in uniformity is minimal "due to the fortuitous nature of accidental injuries and the strong state interest in providing redress for injuries." Rodrigue v. LeGros, 563 So.2d 248, 254 (La.1990). Moreover, the need for uniformity under the general maritime law is prompted primarily by concerns regarding maritime shipping and commerce involving vessels. Green, 593 So.2d at 641.
Louisiana has a strong interest in applying its own law in this case: Plaintiffs are Louisiana residents, defendant the State of Louisiana, and the vessel was registered in *73 Louisiana, owned by a Louisiana L.L.C., and moored in Louisiana. The journey began in Louisiana waters and ended in Louisiana waters.
Given the recreational activity involved in this case bears little if any relationship to maritime shipping and commerce along with the strong Louisiana interest in a case of this nature, we find application of state law would not impermissibly interfere with any required uniformity of general maritime law.
In summary, there is no applicable contrary federal legislation and La. Civ.Code art. 2317 neither prejudices the characteristic features of the general maritime law nor interferes impermissibly with any required uniformity in such law. Therefore, the provisions of the article would apply in this case.

Strict Liability  La. Civ.Code art. 2317
La. Civ.Code art. 2317 provides: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody...." In Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991), this Court explained:
This article imposes strict liability based on a person's relationship of custody (garde) to a defective thing which creates an unreasonable risk of injury to others. King v. Louviere, 543 So.2d 1327, 1329 (La.1989); Loescher v. Parr, 324 So.2d 441, 446 (La.1975). As a general principle, the guardian is in a better position than the innocent victim to detect, evaluate and take steps to eliminate an unreasonable risk of harm arising in a defective thing. Ross, 502 So.2d at 1032; Kent v. Gulf States Utilities Co., 418 So.2d 493, 497 n. 5 (La.1982). In King, we determined that "[t]he things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them." King, 543 So.2d at 1329.
Moreover, this Court explained that "[u]nder most circumstances ownership alone establishes the requisite benefit, control and authority to find garde." Doughty, 576 So.2d at 464. However, although ownership creates the presumption of garde, this presumption is rebuttable by the owner. Finally, whether the law imposes a duty of garde upon a party is a factual inquiry based upon the determination of (1) what benefit the party received from the thing, and (2) what kind of direction and control the party had over it. Doughty, 576 So.2d at 464.
Essential to a finding of liability under article 2317 is a finding of the defendant's relationship of custody to the defective thing. The plaintiffs attempt to prove custody by establishing ownership. Central to the plaintiffs' ownership analysis is La. Civ.Code art. 493.

Ownership  La. Civ.Code art. 493
In finding liability of the State in the present case, both the district court and the court of appeal relied upon Melerine v. State, 00-0162 (La.App. 4 Cir. 11/8/00), 773 So.2d 831, writs denied, 01-0382, 01-0480 (La.4/12/01), 789 So.2d 595, 599, and Anderson v. Tenneco Oil Co., 01-0295 (La. App. 4 Cir. 5/22/02), 826 So.2d 1143, writ denied, 02-2035 (La.11/1/02), 828 So.2d 585.[22] In both cases, the Fourth Circuit *74 relied upon La. Civ.Code art. 493 to establish State ownership and in turn custody of abandoned oil well casings and wood pilings adjacent to an abandoned oilfield platform, respectively.
In Melerine, the Fourth Circuit found:
Thus, the general rule governing ownership of buildings permanently attached to land with the landowner's permission by someone other than the landowner arising from La. C.C. art. 493, as interpreted by Guzzetta, is that ownership reverts by operation of law to the landowner when the maker of the building fails to remove it after he no longer has permission to keep it on the landowner's land. Once the permission to keep the building on the land terminates, the failure to remove the building is considered as a matter of law an indication that the maker of the building intends to surrender ownership to the landowner. Thus, reversion of the ownership of the building to the landowner is controlled, not by the landowner's issuance of the 90-day notice to remove, but by the actions of the maker of the building.
773 So.2d at 838-39. It is upon this conclusion of law that the Fourth Circuit again found the State liable in Anderson and the present case. We find this conclusion of law, however, is flawed. The court of appeal committed legal error in their statutory interpretation by reading out the 90-day written notice requirement.
La. Civ.Code art. 493 provided in 1997:
Buildings, other constructions permanently attached to the ground, and plantings made on the land of another with his consent belong to him who made them. They belong to the owner of the ground when they are made without his consent.
When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner.
In Guzzetta v. Texas Pipe Line Co., 485 So.2d 508, 511 (La.1986), this Court interpreted La. Civ.Code art. 493 to resolve a dispute regarding the removal of a pipeline on leased property, finding:
Comment (b) to C.C. 493 points out that the second paragraph in this article fills a gap in the code, which previously had neglected to specify the rights and obligations between the owner of the improvements and the owner of the ground when their legal relationship terminated. This paragraph may apply when a lease expires, when a predial or personal servitude is extinguished, or when a precarious possessor is given notice to vacate. It gives the owner of the improvements the right to remove them, but if he does not do so ninety days after written demand, the owner of the land acquires ownership of the improvements. It does not give the new owner of the improvements the right to compel removal by the old owner, nor to recover payment for the costs of removal.
The Melerine court did rely on Guzzetta in reaching its conclusion, citing: "Again, after the failure to remove the pipeline within ninety days of written notice, the ownership of the pipeline would revert to *75 the plaintiffs." Melerine, 773 So.2d at 838. (Emphasis in original). The court erred in failing to emphasize the necessary prerequisite for the legal transfer of ownership  "within ninety days of written notice." Rather, the court interpreted the holding in Guzzetta to mean "ownership reverts by operation of law to the landowner when the maker of the building fails to remove it after he no longer has permission to keep it on the landowner's land." 773 So.2d at 838-39. Therefore, the Melerine court concluded the reversion of ownership is controlled not by the landowner's issuance of the 90-day notice to remove, but by the actions of the maker of the building. Id.
Because the lessee in Melerine failed to remove the well casing after it no longer had the right to keep the casing on state property, the court found ownership of the casing reverted to the State, even in the absence of a 90-day demand notice.[23] Contrarily, we find the clear and unambiguous language of La. Civ.Code art. 493 as written in 1997 specifically required written notice or demand prior to the transfer of ownership. La. Civ.Code art. 9.
In the present case, the platform and pilings attached to the land subject to State Lease 8342 were made on the land with the consent of the State. Therefore, upon the termination and release of all rights to the water bottom under State Lease 8342, all the rights in and to the water bottom reverted back to the owner, the State of Louisiana, and according to article 493 as written in 1997, the ownership of the platform and pilings as constructions permanently attached to the ground remained with him who made them, the lessee. The ownership so remains until failure of the lessee to remove the platform and pilings within ninety days of written notice. In the present case, the record contains no evidence of written notice of removal, and accordingly, the ownership of the constructions belongs to him who made them. Ownership has not reverted to the State.[24]

*76 Custody

However, the inquiry does not end there. The liability of La. Civ.Code art. 2317 rests with care, custody, or garde. In Loescher v. Parr, 324 So.2d 441, 451, n. 7 (La.1975), this Court noted:
`(T)he things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them. This relationship will ordinarily be associated with ownership, but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairmen, among others. It will not belong to the agent or the mandatory, the employee or the servant, or to anyone else for whom there is a responsible principal. The owner may transfer the guardianship by transferring the thing to another who will bear such a relationship to the thing as to himself have the care of it. He may also lose the care of this thing, principally by the theft of the thing.' [citing Verlander, We are Responsible ..., 2 Tulane Civil Law Forum, No. 2, p. 64 (1974) (containing a perceptive and thorough analysis of the French, Quebecois, and Louisiana interpretations)].
Thus, as noted above, the issue of custody, care, or garde is resolved through a determination of (1) what benefit the party received from the thing, and (2) what kind of direction and control the party had over it. Doughty, 576 So.2d at 464. In this case, along with the release of the original lease, *77 the district court found the State responsible for the platform and the injuries suffered by the plaintiffs through the declaration of the site as orphaned by the State.[25]
By Acts 1993, No. 404, § 2, the Louisiana Legislature enacted the "Louisiana Oilfield Site Restoration Law," finding that: "(1) A present and future benefit to the environment, public health, safety, and welfare would be to clean up, close, and restore oilfield sites. (2) State laws and regulations must comprehensively address those situations where proper and timely cleanup, closure, and restoration of orphaned oilfield sites must be assured." La.Rev.Stat. §§ 30:80, 30:81.
In the public interest and within the police power of this State, the Legislature established "an oilfield site restoration commission and an oilfield site restoration fund to provide for the proper and timely cleanup, closure, and restoration of oilfield sites, to be administered by the assistant secretary of the office of conservation within the Department of Natural Resources." La.Rev.Stat. § 30:81(B).
Under the provisions of this act, the assistant secretary of the commission has the authority to declare a site an orphaned oilfield site upon a finding that: (1) no responsible party can be located, or such party has failed or is financially unable to undertake actions ordered by the assistant secretary; and (2) the oilfield site either: (a) was not closed or maintained in accordance with all statutory requirements and the regulations adopted thereunder; or (b) constitutes or may constitute a danger or potential danger to the public health, the environment, or an oil or gas strata. La.Rev.Stat. § 30:91(A).
Once a site has been declared orphaned, no sale or removal of property from the orphaned site may be made without the written consent of the assistant secretary, and conducting operations on the site is prohibited without the consent of the assistant secretary. La.Rev.Stat. § 30:91(B)(3) & (4). Further, once a site has obtained orphaned status, the assistant secretary is authorized to conduct site restoration, which is defined by the act as "any and all oilfield site restoration activities required of a responsible party of an oil or gas property by regulations adopted by the office of conservation pursuant to this Subtitle, including without limitation plugging of oil and gas wells, pit closure, site remediation, and removal of oilfield equipment." La.Rev.Stat. § 30:82(11).
Notably the assistant secretary is not required to conduct site restoration, and "[t]he commission, the secretary, and the assistant secretary, and their agents, are not liable for any damages arising from an act or omission if the act or omission is part of a good faith effort to carry out the purpose of this Part." La.Rev.Stat. § 30:95(C). Most importantly, by declaring a site orphaned, the State does not acquire ownership of the site, nor is the State required to light the abandoned structures as the statute does not specifically require such action and does not have regulations to address the lighting of the orphaned site.
*78 Arguably, the act of orphaning the site upon which the platform and pilings at issue are located grant the State with the authority to direct and control the site, specifically direction and control over the restoration of the site, activities conducted on the site, and the sale and removal of property located on the site. At trial, Gary Ross of the Office of Conservation and acting manager of the Oilfield Site Restoration Project from November 1997 to December 2001, explained that declaring a site "orphaned" is strictly a status designation and does not denote control. Moreover, as acknowledged in oral arguments, the record is devoid of any evidence establishing the State ever exercised its authority to direct or control the site.
This is not to say the State may never be found to exercise its authority to direct and control. Rather, we find the State is not liable when the State merely engages in regulatory activity because regulatory acts and even ownership do not necessarily give custody and garde to the State, especially in these circumstances where ownership of the structure still rests with the permittee. To find otherwise in this case would not further the social utility of our strict liability principles, nor would it be feasible to hold the State liable merely through the exercise of its regulatory function. Direction and control must be established on a case by case basis, determined upon facts demonstrating actual acts of direction and control other than regulation.
Nevertheless, control and direction are not enough to establish custody, care, or garde and to rebut the presumption of garde arising from ownership or the understanding that guardianship of a thing from which liability arises rests with the owner until such time as it is transferred to another. See Jacobs v. Spinnakers, 474 So.2d 1019, 1022 (La.App. 5th Cir.1985), writ denied, 478 So.2d 149 (La.1985). To establish garde, the record must show what benefit the State received from the abandoned platform.
One can assume that no party would debate the fact the State did derive a benefit from the platform during its productive years. On the other hand, the State during those years did not exercise any direction or control over the platform other than its authorized regulatory functions and the benefit to the lessee in those years most likely far outweighed the benefit derived by the State. Moreover, although the Louisiana Oilfield Site Restoration Law does acknowledge a benefit to the State to clean up, close, and restore oilfield sites, the record is devoid of evidence demonstrating any benefit received by the State from the abandoned platform at issue. Rather, the record shows the platform served as a hazard and obstruction to navigation. Mr. Ross explained that "orphaned" denotes a site that has no further use. The record is clear that at the time of the accident, the State exercised no direction or control over the structure and derived no benefit from the structure.
Therefore, at the time the allision occurred, the State did not have custody or garde of the platform as the State neither owned, nor controlled or benefitted from the abandoned platform. Moreover, although a defendant's garde of a thing can form the basis for fault in negligence under a duty-risk analysis, no such basis exists for La. Civ.Code art. 2315 negligence in the absence of garde as well as ownership. Accordingly, the State owed no duty to the plaintiffs to protect against the harm they suffered, and in the absence of such duty, we find the lower courts erred in finding the State liable.

CONCLUSION
In this maritime personal injury case, we find our state law principles of strict *79 liability announced in La. Civ.Code art. 2317 may apply as a supplement to the remedies available under general maritime law as article 2317 does not impermissibly conflict with the substantive general maritime law. Nevertheless, in the absence of either ownership or custody of the structure, we find the State had no duty to light the structure and, therefore, plaintiffs failed to establish liability under article 2317. Accordingly, we reverse the judgment of the lower courts, finding the courts were correct in their holding our state law may supplement general maritime law in this case, but erred in their application of the law. Moreover, insofar as Melerine and Anderson are inconsistent with the views expressed in this opinion and specifically the statutory interpretation of Article 493, they are reversed.

DECREE
For the foregoing reasons, we reverse the court of appeal's judgment.
REVERSED.
NOTES
[*] Retired Judge Philip C. Ciaccio, assigned as Justice Pro Tempore, sitting for Associate Justice Catherine D. Kimball.
[1] "An allision is a collision between a moving vessel and a stationary object." Thomas J. Schoenbaum, Admiralty and Maritime Law § 14-2, 89, n. 1 (4th ed.2004). "Allision. The running of one vessel into or against another, as distinguished from a collision, i.e., the running of two vessels against each other. But this distinction is not very carefully observed." Black's Law Dictionary, 75 (6th ed.1990).
[2] The vessel was described as "a typical thirty-eight foot sport fisherman, flying bridge, and a little birth [sic] inside and a small lounge area and a sport cockpit for fishing in the back." R., V. 6, pp. 1094-95.
[3] According to the testimony in the record it appears the LLC is owned 50% by Joseph Jagousa and 50% by Parkview Limited Partnership, of which plaintiff Leon L. Giorgio's company, Select Property, is the general partner, owning 99% of the limited partnership, and Giorgio and his business partner, Don Moffit, own 1 or 2 %. R., V. 6, p. 1131-32.
[4] R., V. 6, p. 1095.
[5] R., V. 6, pp. 1095, 1100.
[6] R., V. 6, p. 1101.
[7] R., V. 6, pp. 1101-02.
[8] The platform was equipped with a "self-tending" light system with a light fixture on each of the four corners of the platform with a red shell to cast off a red navigational light. The batteries of this lighting system were recharged by solar power, but due to limited shelf life, the batteries eventually would go out, approximately in three to four years. R., V. 7, pp. 1374-76.
[9] Giorgio testified that as best as he could recall the lower or short range setting of the radar "went down to a quarter of a mile or a half of a mile," while the highest or long range was 24 miles. R., V. 6, p. 1151.
[10] R., V. 6, p. 1102.
[11] The piling the plaintiffs allided with was a "mooring for a barge for taking fluids on and off the platform." R., V. 7, p. 1278. Moorings normally rise 6 to 8 feet above the water, and this mooring had no reflectors. Id.
[12] R., V. 4, p. 691 (Letter State Mineral Board dated November 17, 1993).
[13] Made defendants were (1) Alliance Operating Corporation; (2) Gulfstream Resources, Inc.; (3) Burlington Resources Offshore Inc. and/or Burlington Resources Hydrocarbons, Inc., and/or Burlington Resources Marketing, Inc., and/or Burlington Resources Oil & Gas Company, Trading, Inc.; (4) Chevron USA, Inc.; (5) Superior Oilfield Services, Inc.; (6) State of Louisiana through the Department of Natural Resources; and (7) Lloyds Underwriters.

Moreover, the plaintiffs initially filed separate petitions, but the cases were subsequently consolidated. Therefore, any supra or infra references to the record, i.e., R., refer to the record in Leon L. Giorgio, Jr. v. Alliance Operating Corporation, et al., # 44-386. Any references to R.II, refer to the record in Jacques A. Sanborn v. Alliance Operating Corporation, et al., # 44-387.
[14] See R., V. 5, p. 956 (Reasons for Judgment); see also, R., V. 2, p. 252 (Final dismissal of Burlington); R., V. 3, p. 409 (order dismissing Alliance and Gulfstream); R. V. 4, p. 860 (order dismissing Chevron); R., V. 5, p. 947 (order dismissing Lloyds). Note, based on review of the record, no order of dismissal as to the plaintiffs' claims against Superior is contained in the record. However, Superior was not represented at trial nor did the plaintiffs proceed against Superior at trial. By all appearance, Superior was dismissed at some time prior to time of trial.
[15] In both Anderson and Melerine, the court of appeal found the State had ownership and/or garde over abandoned oil well casings and wood pilings surrounding the oil well casing located on leased State property under La. Civ.Code art. 493, erroneously reasoning that the State as the owner of the water bottoms which the casings and pilings were located became the owner and/or custodian of the abandoned structures when they were not removed within 90 days after the lease was terminated, even in the absence of a written notice of removal. This erroneous reasoning will be discussed infra. With the finding of ownership and/or garde, the court of appeal further found the State liable under La. Civ. Code art. 2317's strict liability principle for damage caused by the abandoned structure located on its property, as well as article 2315's negligence theory.
[16] In its application, the State asserts the district court erred in not finding the plaintiff, Giorgio, 100% liable for violation of the Inland Rules of Navigation Act of 1980. Because we find the State had no duty to light the structure, we pretermit any discussion of plaintiffs' liability or fault.
[17] Superceded in part by statute, see Executive Jet Aviation, Inc. v. City of Cleveland, Ohio, 409 U.S. 249, 253, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).
[18] R., V. 1, p. 25 (Giorgio's Petition for Damages); R.II, V. 1, p. 26 (Sanborn's Petition for Damages).
[19] 33 C.F.R. § 67.05-1 (1997) provides:

(a) Structures having a maximum horizontal dimension of 30 feet or less on any one side, or in diameter, shall be required to have one obstruction light visible for 360 deg.
(b) Structures having a maximum horizontal dimension of over 30 feet, but not in excess of 50 feet, on any one side, or in diameter, shall be required to have two obstruction lights installed on diagonally opposite corners, 180 deg. apart, or as prescribed by the District Commander, each light to have a 360 deg. lens.
(c) Structures having a horizontal dimension of over 50 feet on any one side, or in diameter, shall be required to have an obstruction light on each corner, or 90 deg. apart in the case of circular structures, or as prescribed by the District Commander, each light to have a 360 deg. lens.
(d) Where the overall dimensions of a structure require the installation of two or more obstruction lights, the lights shall all be mounted on the same horizontal plane within the limitations of height specified in Sec. 67.20-5, Sec. 67.25-5, or Sec. 67.30-5, as applicable.
(e) Lesser structures and piles, pile clusters or flare templates, etc., will not normally be required to be marked by obstruction lights, when they are located within 100 yards of a Class "A", "B" or "C" structure marked by established obstruction lights, but they shall be marked with red or white retro-reflective material, installed as prescribed by the District Commander.
(f) All obstruction lights shall be installed in a manner which will permit at least one of them to be carried in sight of the mariner, regardless of the angle of approach, until he is within 50 feet of the structure, visibility permitting.
[20] The permits specifically provide:

That this permit may not be transferred to a third party without prior written notice to the District Engineer, either by the transferee's written agreement to comply with all terms and conditions of this permit or by the transferee subscribing to this permit in the space provided below and thereby agreeing to comply with all terms and conditions of this permit. In addition, if the permittee transfers the interests authorized herein by conveyance of realty, the deed shall reference this permit and the terms and conditions specified herein and this permit shall be recorded along with the deed with the Register of Deeds or other appropriate official.
[21] 33 C.F.R. § 66.01-55 (1997) provided:

(a) When any private aid to navigation authorized by the District Commander, or the essential real estate or facility with which the aid is associated, is sold or transferred, both parties to the transaction shall submit application (Sec.66.01-5) to the Commander of the Coast Guard District in which the aid is located requesting authority to transfer responsibility for maintenance of the aid.
(b) The party relinquishing responsibility for maintenance of the private aid to navigation shall indicate on the application form (CG2554) both the discontinuance and the change of ownership of the aid sold or transferred.
(c) The party accepting responsibility for maintenance of the private aid to navigation shall indicate on the application form (CG2554) both the establishment and the change of ownership of the aid sold or transferred.
(d) In the event the new owner of the essential real estate or facility with which the aid is associated refuses to accept responsibility for maintenance of the aid, the former owner shall be required to remove the aid without expense to the United States. This requirement shall not apply in the case of any authorized private aid to navigation required by statute or regulation (Class I, Sec. 66.01-15) which shall be maintained by the new owner until the conditions which made the aid necessary have been eliminated.
[22] As this Court noted in Long v. State of Louisiana, Through the Department of Transportation and Development, 04-0485, p. 4, n. 7 (La.6/29/05), 916 So.2d 87, "[t]he denial of a writ in this Court has no precedential value and should in no way be construed as an adoption of a court of appeal's ruling or reasoning."
[23] The Melerine court stated the lessee lost all rights to the casing under the lease agreement and under La. Civ.Code art. 493. The lease agreement in this case as well provides the oil well casing become the property of the State if not removed within a year of termination. State Lease No. 8342, R., V. 4, p. 655. The well casing are not at issue in this case. Moreover, the Melerine court erred in its interpretation of this Court's holding in Guzzetta.
[24] As an aside, we note in their brief to this Court, the plaintiffs submit "this Honorable Court's granting of the State's Writ Application may have been prompted by the Legislature's passage of Act 715 amending Civil Code Article 493 and its concurrent House Resolutions declaring its intent that the change be considered `interpretive and procedural' and that it be applied retroactively." Although the revision to article 493 is not applicable in the present case and even though this case does present this Court with the opportunity to correct the court of appeal's misinterpretation of this Court's holding in Guzzetta in which this court found article 493 clearly required written notice of removal as a prerequisite to the transfer of ownership of the constructions, merely as information, Act 715 adds language to the second paragraph of article 493 to read:

When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within ninety days after written demand, the owner of the land may, after the ninetieth day from the date of mailing the written demand, appropriate ownership of the improvements by providing an additional written notice by certified mail, and upon receipt of the certified mail by the owner of the improvements, the owner of the land obtains ownership of the improvements and owes nothing to the owner of the improvements. Until such time as the owner of the land appropriates the improvements, the improvements shall remain the property of he who made them and he shall be solely responsible for any harm caused by the improvements.
The intent of the Legislature in the passage of Act 715 was expressed in House Concurrent Resolution No. 134 of the 2004 Regular Session:
WHEREAS, prior to the adoption of Act No. 715, Civil Code Article 493 was silent as to ownership of abandoned improvements when the landowner had not made demand on the owner of the improvements to remove them: and
WHEREAS, the Fourth Circuit Court of Appeal of Louisiana, in two cases, Melerine v. State, XXXX-XXXX (La.App. 4 Cir. 11/8/00), 773 So.2d 831, and Anderson v. State of Louisiana Natural Resources Department [sic], XXXX-XXXX (La.App. 4 Cir. 5/22/02), 826 So.2d 1143, held that the ownership of abandoned oil field equipment transfers to the landowner when the owner of the equipment fails to remove the works at the termination of the lease, even though the landowner has not demanded their removal; and....
WHEREAS, the Federal Oil Pollution Act of 1990 (33 U.S.C. § 2701) authorizes the United States Coast Guard and the United States Environmental Protection Agency to remove abandoned oil field facilities which discharge or threaten to discharge oil and mandates those agencies to recover the costs incurred in the removal of such facility from the owner or operator thereof; and
WHEREAS, the Coast Guard interprets Article 493, as it existed prior to the adoption of Act No. 715, consistent with the holdings in Melerine and Anderson and treats the owner of land on which an abandoned oil facility is located as the owner of the facility and, therefore, as responsible for the cost of removing the facility, even though the landowner never owned or operated the facility, except to the extent provided by Article 493; and
WHEREAS, the Coast Guard, despite the revision of Article 493 by Act 715 of the 2003 Regular Session, continues to pursue landowners who have neither owned nor operated facilities subject to the provision of the Oil Pollution Act for the recovery costs incurred in the removal of those facilities, on the basis of the decisions in Melerine and Anderson notwithstanding the fact that the landowner has not made demand on his former lessee for removal of the facility, it being the position of the Coast Guard that the revision of Article 493 is prospective only and does not relieve a landowner of ownership of and responsibility for facilities abandoned prior to the effective date of Act No. 715...."
[25] The court of appeal cites to the Louisiana Underwater Obstruction Removal Program to establish the State has a significant interest in seeing to it that structures such as the one involved in the instant case are maintained in a safe condition, quoting the purpose of the program "to provide for the proper and timely identification, inventory, and removal of underwater obstructions which are a hazard to navigation and commercial fishing in this state." La.Rev.Stat. 30:101.2. However, the Louisiana Underwater Obstruction Removal Program is not applicable in this case as it is superceded in authority by the Louisiana Oilfield Restoration Law, under which the site in issue was declared orphaned by the State.