712 So.2d 1072 (1998)
Verl DAY and Betty L. Day
v.
TOUCHARD, INC.
No. 97-CA-1180.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 1998.
*1073 Eugene A. Ledet, Jr., Alexandria, for Appellants Verl Day and Betty L. Day.
James R. Silverstein, Frilot, Partridge, Kohnke & Clements, New Orleans, for Appellee Touchard, Inc.
Wayne G. Zeringue, Jr., New Orleans, for Intervenor Texaco Inc. and Insurance Company of North America.
Before DUFRESNE, WICKER and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiffs, Verl Day and Betty Day, his wife, appeal from the dismissal of their personal injury lawsuit against defendant, Touchard, Inc., for injuries which Verl Day incurred when he fell aboard an offshore transport vessel owned by defendant. The workers compensation intervener, Texaco, Inc. (Texaco), also appeals from the judgment. We affirm.
Verl Day was employed by Texaco as a compressor mechanic stationed at Texaco's Garden Island Bay facility in Plaquemines Parish, Louisiana. On December 7, 1990, he was instructed to make repairs at an offshore platform located in South Pass, Block 75, in the Gulf of Mexico (Gulf). Transportation was provided by defendant on the M/V EVELYN, a 65 foot crew boat. The vessel was time chartered by Texaco for the transport of its employees. During the trip to the offshore facility, Verl Day fell in the wheelhouse and injured himself.
Plaintiffs filed suit on November 8, 1991 for Verl Day's injuries and for Betty Day's loss of consortium. On May 12, 1994 Verl Day was denied an attempt to supplement his lawsuit to assert a cause of action under the General Maritime law.[1] A jury trial was held on May 16, 17, 18, and 19, 1994. Following the trial, the jury found that defendant was not negligent. The trial judge subsequently rendered a judgment in conformity with the jury verdict and dismissed plaintiffs' suit. The trial judge assessed costs against plaintiffs.
On appeal, Verl Day asserts that the jury was manifestly erroneous in concluding that defendant was not negligent and that he is entitled to damages.[2]
Texaco also appeals and aligns itself with Verl Day for purposes of the appeal. Texaco adopts Verl Day's arguments and asks for reimbursement of the stipulated medical expenses and workers compensation payments made to and for his benefit in the total amount of $29,133.17.
*1074 Thomas Cutchall, the licensed Captain and operator of the boat, was 21 years old when the accident happened. He had been working for defendant for five years and operated the crew boat for two years. He had a Masters, or Captain's, license from the United States Coast Guard. Photographs of the crew boat show that the interior has two rows of bench-type seats separated by an aisle. Life jackets are stored above the seats. A restroom is located in the back of the vessel on the left side of the aisle. The wheelhouse, located in a raised area in front of the passenger compartment, is entered from three steps and contains only one seat.
Captain Cutchall testified that Verl Day and another worker, Robert Griffin[3] (Griffin) were transported to his boat from another smaller "John boat". When they got on board, the two put their tool boxes on the back deck of the vessel. Besides these three people, a deckhand, Ray Knight (Knight), was also on board. Captain Cutchall testified that the trip from the dock to Main Pass 75 was about 1½ hours. They were in protected waters for 90% of the trip (about 1 hour and 10 minutes) before entering the Gulf. The weather was typical for winter. Winds were from the north, at about 12-20 miles per hour and the seas were about 6 feet high. At the time of the accident, the vessel had been in the Gulf for about 10 minutes. The depth of the water was approximately 12 feet. As the water got deeper, Captain Cutchall said that the ride gets smoother because the waves are farther apart.
Captain Cutchall was seated in the wheelhouse operating the vessel when Verl Day left his seat and entered the wheelhouse. He suggested to the Captain that the water might be too rough. Captain Cutchall told him that the seas would soon be calming down and that he should take a seat. Just then, he heard Verl Day slip and fall. He did not remember asking Verl Day to hand him a bottle of window cleaner or any other thing. Captain Cutchall stated that he did not see Verl Day fall, but it happened right above the stairs in the wheelhouse. He did not know whether these events took place within 30 seconds or a minute. Captain Cutchall, Griffin (who had been sleeping) and Knight all went to Verl Day's aid. They picked him up and placed him on a seat. Captain Cutchall then reported the accident to Mike Crane, Verl Day's supervisor, telling him that he appeared to be hurt and that he wanted to return to shore. Captain Cutchall was instructed to return and Verl Day was taken back to Garden Island Bay. Captain Cutchall did not recall what part of Verl Day's body was hurt.
Captain Cutchall testified that Texaco had a rule that passengers are to remain seated while the vessel is in transit. No one is supposed to enter the wheelhouse to speak with the operator. Captain Cutchall thought that it was a good rule to prevent accidents. He said that if the vessel is in rough water it was difficult to stand. Captain Cutchall said that he had transported Verl Day on other occasions and that he, before, had never left his seat to come into the wheelhouse. He said the rule was that no one was supposed to go into the wheelhouse during transport, but sometimes the rule got bent in order to use the radio or if someone wanted to tell him where to drop off a person. Passengers also left their seats to use the restroom. He always told them to sit back down when they were finished.
Captain Cutchall testified that the wheelhouse had port (left) and starboard (right) doors leading to the outside deck. The port door "for sure had a leak in it." He referred to the leak as a "small seepage, a very small seepage." Captain Cutchall and/or others had tried to fix it, but were unsuccessful. He did not believe that the starboard door leaked, but indicated that it might have. At any rate, the leaking door or doors allowed a very small amount of water, "like a fresh mopped floor" to accumulate on the linoleum floor. He further noted that the windows and doors in the passenger section were watertight and did not leak.
*1075 Verl Day was 60 years old at the time of trial, married, with grown children. His history included Navy service and a long work record performing manual labor in the oilfields of Wyoming and Louisiana. At one time he also had a Master's license, but he let it go after starting work with Texaco in 1967. Verl Day obtained some college credits, but did not finish. He was promoted to compressor mechanic in the early 1980's and was responsible for maintaining and repairing several compressors. He stated that the machines were bigger than the courtroom. The Main Pass 75 platform was the only one in open water, the rest were in protected waters. Verl Day testified that he carried his personal tools up steps to the compressor. The boxes weighed about 100-150 pounds. The heavier items are lifted by crane.
Verl Day testified that the day of the accident was the first of seven work days. The testimony of Verl Day and Captain Cutchall, concerning the events leading to the accident, were similar. Verl Day said that many times he had ridden on the M/V Evelyn prior to the accident, with Captain Cutchall or his relief. He said that he and the helper, Griffin, were first transported on the "jo-boat". They had to load their tool boxes on both vessels. He said that he did not like putting the boxes on deck, but did not explain why. While they were in protected waters he did not pay attention to the weather. When they got into the Gulf, the ride was rough. He was not sure if he slept at all on the trip to the Gulf, but did not think so. Verl Day testified that suddenly he heard a big bang on the back deck. He had been lying down and looked up to see his helper walking back to his seat from somewhere. He said that he could hear the waves slapping the side of the boat. Verl Day got up and walked to the Captain's cabin, "... concerned that was my tool box that went overboard with all that noise, ..." He did not go out because it would not have made any difference if the tool box had fallen overboard and because it was too rough to open the back door. Instead, he chose to leave his seat and go to the wheelhouse to speak to Captain Cutchall. He said that he had to go into the wheelhouse because it was too noisy from the engines to communicate from his seat. Verl Day also wanted to talk to the Captain about the rough seas because he was concerned that the conditions would make it difficult and dangerous to be lifted in the personnel basket onto the platform. Verl Day said that if the seas were rough at the platform, the personnel basket, used to convey them and their heavy tool boxes from the boat to the platform, would be acting like a yo-yo or bungee string. He noted that they could not use the stairs to the platform deck because of the weight of the tool boxes. However, he recognized that how they got up to the platform was not the Captain's concern or responsibility. Verl Day received and was familiar with the Texaco Safety Manual. He acknowledged that passengers were supposed to remain in their seats when the vessel was underway. He testified that, until that day, he had always obeyed the rule.
Verl Day testified that when he entered the wheelhouse, he wanted to see how rough it was, but could not see out of the windows. He did not know if the windows were fogged inside or whether it was from the waves outside. He was not there very long. Verl Day said that he held onto a handrail that went around the room and down in a direction away from the passenger compartment. He assumed that the rail went to the living quarters. Verl Day noticed that the radar was on and that the waves were hitting the whole front of the boat. He also noticed that there was water on the floor of the wheelhouse, but could not describe how much. He said that he generally watches where he walks because he often had to deal with oil, grease and water on the floors in his work. Despite the water on the floor, he entered the wheelhouse.
Verl Day stated that he thought water was coming from the door when a wave hit, but he could not say that with certainty. He noted that the floor was covered in linoleum and that it lacked a no-skid surface. He testified that the floor was slick when he stepped on it and commented that linoleum was slick even when it is damp. Verl Day's clothes were wet when he was helped to his seat after the fall. He testified that when he entered the wheelhouse, the Captain "... asked him to hand him some 409 window *1076 cleaner or whatever it was, it was on the back shelf." He said further that "I reached back and got it and handed it to him and that's the last I remember until I woke up on the floor." He does not remember the Captain telling him to sit down, but did not dispute the Captain's authority to have told him so. Verl Day assumed that he was knocked unconscious, since the last thing he remembers, before waking up lying on the floor, was standing in the wheelhouse. Verl Day said that when he awoke his body was hurting. He did not know if the tools actually fell off the boat, but assumed they did not since nothing was said to him about it later. Verl Day testified that he did not know why he fell. In his deposition referred to at trial, Verl Day testified that he lost his balance because of the rough seas.
Captain Thomas Dyer, an expert in Maritime Operations, testified relative to crew boats and to the job duties of a Captain of a crew boat. He noted that it is common for an oil company to retain the services of a company to provide transportation on a vessel from land to an oil platform. The boat captain is dispatched by an oil company employee with the pertinent instructions. However, the captain of the vessel makes the decision as to whether the trip can be safely made. He has the overall authority on the vessel. He is responsible for the safe operation of the vessel and the safety of the crew and passengers. He does not consult with the passengers as to whether the vessel should continue or return to shore.
Captain Dyer testified that in the winter months, 6 foot seas are routine and average for the Gulf. This crew boat was 65 feet in length and could safely handle 6 foot seas. Captain Dyer stated that the Texaco rule for passengers to remain seated is an excellent rule, because moving vessels are subject to all kinds of sudden, abrupt and unexpected motions. An individual standing up is most likely to lose his balance and fall. Here, Verl Day violated the rule and risked himself. By not staying in his seat, he subjected himself to the motion of the vessel and by doing so, caused his own accident.
Captain Dyer testified that watertight doors commonly leak on crew boats. He said that they are made out of aluminum and tend to get out of adjustment. They are difficult to seal, but the company here had previously tried to fix the doors. Captain Dyer testified that a slight amount of seepage is quite common, does not degrade the seaworthiness of the vessel and generally does not cause problems.

ANALYSIS
As a general rule, the state court applies the maritime or admiralty law to a case involving the injury of a passenger on a vessel, whether or not the petition designates it as such. See: In Green v. Industrial Helicopters, Inc., 593 So.2d 634, 637 (La. 1992). Under general maritime law, factual findings made by the trial court are reviewed under the clearly erroneous standard. Gaston v. G & D Marine Services, Inc., 93-0182 (La.App. 4th Cir. 1/19/94), 631 So.2d 547, 552. Under the manifest error standard, the court of appeal may not set aside the trial court's findings of fact unless the findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); O'Boyle v. Piglia, 95-990 (La. App. 5th Cir. 2/27/96), 670 So.2d 1339, 1342; Badeaux v. State, Dept. of Transp. and development, 96-853 (La.App. 5th Cir. 2/25/97), 690 So.2d 203, 208. Furthermore, "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart v. State, 617 So.2d 880, 882-883 (La.1993). However, a proper review of the record cannot be completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court. There must be a further determination that the factfinder's conclusion is reasonable in light of the entire record. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216, 220.
A vessel or her crew are not the insurers of the safety of those who board her. Counts v. Lafayette Crewboats, 622 F.Supp. 299, 301 (W.D.La.1983). However, a guest aboard a vessel is owed the duty of reasonable care under the circumstances. Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 79 S.Ct. 406, 407, 3 L.Ed.2d 550 *1077 (1959); Stephens v. Pacific Employers Ins. Co., 525 So.2d 288, 291 (La.App. 1st Cir. 1988). In turn, the passenger must also exercise reasonable care and prudence for his own safety. Counts v. Lafayette Crewboats, 622 F.Supp. at 301.
In this case, the vessel owner owed a duty of reasonable care to Verl Day and other passengers. However, the passenger compartment of the vessel was watertight and contained no defects. While the wheelhouse floor had a misty layer of water from a leaking door, the evidence was inconclusive that the water caused Verl Day to fall. In fact, at trial, he testified that he did not know why he fell. In his deposition, used at trial, he said that it was the movement of the boat from the waves. Thus, even if the water on the wheel-house floor constituted a defect for which defendant could be held liable, Verl Day failed to show that the water on the wheelhouse floor caused the accident. Consequently, we find that defendant's conduct was not the cause in fact of Verl Day's injuries.
In addition, Verl Day knew that he was supposed to remain seated during transport because the vessel's sudden movements could cause a standing person to fall. Nonetheless, he left his seat in rough conditions, albeit for what he considered to be a good reason. Further, he saw the water on the floor of the cabin, but chose to walk on it anyway. Captain Cutchall testified that he instructed him to return to his seat, aware of the instability of the vessel in these conditions and further aware of the rule that passengers remain seated. Verl Day did not remember this, but thought that Captain Cutchall asked him to hand him a bottle of window cleaner. Captain Cutchall denied this. Whether Verl Day was asked to sit down or hand the cleaner is not dispositive of defendant's negligence. The important fact is that, by leaving his seat and walking on a wet surface in rough waters, Verl Day failed to exercise reasonable care and prudence for his own safety. Thus, we find no manifest error in the jury's conclusion that defendant was not negligent.
Accordingly, the judgment of the trial court is hereby affirmed.
Costs of this appeal are to be paid by Verl Day.
AFFIRMED.
NOTES
[1] Writs were applied for from this ruling and denied on May 17, 1994 in 94-C-364.
[2] Betty Day did not brief nor argue her loss of consortium claim. Thus, we consider it waived.
[3] At one point, the transcript refers to him as Robert Cricker with a notation that this was a phonetic transcription.