GUIDRY, J.
 

 12In this action seeking recovery for personal injuries sustained in a boating accident, plaintiff, Timothy K. Dunaway, appeals from the trial court’s judgment, granting summary judgment in favor of defendants, Secret Cove, LLC, Essex Insurance Company, Deborah Hogan and Robert Hogan. For the reasons that follow, we reverse and remand.
 

 FACTS AND PROCEDURAL HISTORY
 

 On April 12, 1998, Timothy Dunaway was operating his recreational motor boat on the Pearl River Navigational Canal located in St. Tammany Parish when the boat struck a submerged sandbar, causing Dunaway’s face to hit the aluminum windshield frame of the boat. Thereafter, Dun-away filed a petition for damages, naming Robert Hogan, Deborah Hogan, Secret Cove, LLC, and Essex Insurance Company as defendants and claiming that his injuries and damages were proximately and legally caused by the fault of the defendants: (1) in negligently performing work on their property that caused, contributed to, and/or resulted in the formation of the sandbar; (2) in failing to warn of the submerged sandbar; (3) in failing to mark or identify the submerged sandbar; (4) and in failing to remove the submerged sandbar.
 
 [1]
 

 
 *231
 
 On November 27, 2007, the defendants filed a motion for summary judgment asserting that Dunaway cannot maintain a cause of action for negligence against them because the undisputed facts establish that defendants in no way caused formation or growth of the sandbar, or alternatively, that the defendants did not owe a duty to Dunaway pursuant to the provisions of La. R.S. 9:2795, or under general maritime law negligence principles or La. C.C. art. 2315. Following a | ..¡hearing, the trial court granted summary judgment in favor of the defendants and dismissed Dunaway’s claims.
 

 Thereafter, Dunaway filed a motion for reconsideration of the trial court’s judgment or a motion for new trial. Dunaway asserted that the trial court failed to consider the fact that the defendants owned the bottom of the Pearl River Navigational Canal, which contained the submerged sandbar, and ownership in accordance with La. C.C. art 499 creates a genuine issue of material fact that forecloses summary judgment. The trial court granted Dunaway’s motion for new trial for re-argument only, which was to be submitted by memoranda, and permitted the parties to introduce any affidavits or attachments previously submitted in connection with the motion for summary judgment. After considering the memoranda and exhibits attached thereto, the trial court rendered judgment on March 6, 2008, granting summary judgment in favor of the defendants and dismissed Dunaway’s claims with prejudice. Dunaway now appeals from this judgment.
 

 DISCUSSION
 

 Motion for Summary Judgment
 

 On appeal, summary judgments are reviewed
 
 de novo,
 
 using the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate.
 
 Lieux v. Mitchell,
 
 06-0382, p. 9 (La.App. 1st Cir.12/28/06), 951 So.2d 307, 314. The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B);
 
 Independent Fire Insurance Company v. Sunbeam Corporation,
 
 99-2181, p. 7 (La.2/29/01), 755 So.2d 226, 230-231.
 

 |/The burden of proof on a motion for summary judgment is on the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to provide factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966(C)(2).
 

 A genuine issue is a triable issue. More precisely, an issue is genuine if reasonable persons could disagree. If on the state of the evidence, reasonable persons could reach only one conclusion, there is no need for a trial on that issue. In determining whether an issue is genuine, courts cannot consider the merits, make credibility determinations, evaluate testimony, or weigh
 
 *232
 
 evidence.
 
 Smith v. Our Lady of the Lake Hospital Inc.,
 
 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751. A fact is material when its existence or nonexistence may be essential to plaintiffs cause of action under the applicable theory of recovery. Facts are material if they potentially insure or preclude recovery, affect a litigant’s ultimate success, or determine the outcome of the legal dispute.
 
 Smith,
 
 93-2512, 639 So.2d at 751. Because it is the applicable substantive law that determines materiality, whether or not a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case.
 
 Charlet v. Legislature of the State of Louisiana,
 
 97-0212, p. 7 (La.App. 1st Cir.6/29/98), 713 So.2d 1199, 1203,
 
 writs denied,
 
 98-2023, 98-2026 (La.11/13/98), 730 So.2d 934.
 

 |
 
 Applicable Law
 

 Dunaway asserts that general maritime law governs his claims against the defendants, or alternatively, that his claims are governed by any other federal or state statute that may be applicable. The judicial power of the United States extends to all cases of admiralty and maritime jurisdiction. U.S. Constitution, Art. Ill, § 2;
 
 Wall v. Calcasieu Parish Police Jury,
 
 02-451, p. 3 (La.App. 3rd Cir.12/11/02), 833 So.2d 528, 530. State courts, however, have concurrent jurisdiction by virtue of the “savings to suitors” clause of the Judiciary Act of 1789. 28 U.S.C.A. § 1333;
 
 Wall,
 
 02-451 at p. 3, 833 So.2d at 530-531. The current test of admiralty tort jurisdiction requires that an incident (1) occur on navigable waters, i.e., a maritime locality, and (2) have a maritime connection or flavor, i.e., a maritime nexus.
 
 Giorgio v. Alliance Operating Corporation,
 
 05-0002, p. 9 (La.1/19/06), 921 So.2d 58, 66.
 

 In Louisiana, waterways are navigable in law when they are used or susceptible of being used in them natural and ordinary condition as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on the water.
 
 Ramsey River Road Property Owners Association, Inc. v. Reeves,
 
 396 So.2d 873, 876 (La.1981). Simply stated, a water course is navigable when by its depth, width, and location it is rendered available for commerce.
 
 Shell Oil Company v. Pitman,
 
 476 So.2d 1031, 1036 (La.App. 3rd Cir.1985).
 

 While navigability is a question of fact, the undisputed evidence establishes, and the parties agree, that a tugboat pushed a commercial barge through the entire length of the Pearl River Navigational Canal a few weeks following Duna-way’s accident. During its transit, the barge did run aground of the sandbar at issue in the instant case; however, it was able to dig away some of the sand and pass by the narrow area of the canal to successfully navigate the entire canal. This transit | ^demonstrates that the canal was capable of being used in commerce, despite the fact that the canal was not then advertised by the United States Army Corps of Engineers as open for commercial navigation and had not been used for commerce since a few years following its last dredging in 1990.
 
 [2]
 

 See Richardson v. Foremost Insur
 
 
 *233
 

 ance Company,
 
 641 F.2d 314, 316 (5th Cir.1981),
 
 aff'd sub nom, Foremost Insurance Company v. Richardson,
 
 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982) (finding that the place where the accident occurred is seldom used for commercial activity, but admiralty jurisdiction does not only extend to navigable waterways that presently function as commercial arteries; rather, if the waterway is capable of being used in commerce, that is a sufficient threshold to invoke admiralty jurisdiction.) Accordingly, we find that it was sufficiently shown that the canal is a navigable waterway so as to satisfy the first element of the test for admiralty jurisdiction.
 
 See Dunaway v. United States of America,
 
 98-2035 (E.D.La.2000) (unpublished opinion).
 

 Having determined that the Pearl River Navigational Canal is a navigable waterway for purposes of admiralty jurisdiction, we now must determine whether the incident in question has a maritime connection or nexus. In making such a determination, a court asks (1) if the type of incident involved has the potential to disrupt maritime commerce, and (2) if the general activity involved bears a substantial relationship to a traditional maritime activity.
 
 Giorgio,
 
 05-0002 at p. 9, 921 So.2d at 67.
 

 17Punaway asserts that the defendants negligently performed work on their property, which either caused the formation of the sandbar or contributed to the formation of the sandbar such that it formed an obstruction to navigation and caused Dun-away’s accident and injury. Federal maritime law recognizes that when a pleasure boat is involved in an allision, where the vessel impacts with some allegedly negligently placed navigational object, the test for establishing a maritime nexus is met.
 
 See Weatherford v. United States,
 
 957 F.Supp. 830, 832-833 (M.D.La.1997);
 
 Wilder v. Placid Oil Company,
 
 611 F.Supp. 841, 845 (W.D.La.1985),
 
 aff'd sub nom, Sanders v. Placid Oil Company,
 
 861 F.2d 1374 (5th Cir.1988);
 
 Respess v. United States,
 
 586 F.Supp. 861, 865 (E.D.La.1984).
 

 Because we find that Dunaway’s claims against the defendants meet the test of admiralty tort jurisdiction, we now turn our attention to determining whether the trial court was correct in granting summary judgment in favor of the defendants, dismissing Dunaway’s claims with prejudice.
 

 Analysis
 

 As a general proposition, a maritime claim brought in state courts is governed by the same principles as govern actions brought in admiralty, i.e., by federal maritime law.
 
 Green v. Industrial Helicopters, Inc.,
 
 593 So.2d 634, 637 (La.1992),
 
 cert. denied,
 
 506 U.S. 819, 13 S.Ct. 65, 121 L.Ed.2d 32 (1992). The elements of a maritime negligence cause of action are essentially the same as land-based negligence. Wit
 
 hhart v. Otto Candies,
 
 L.L.C., 431 F.3d 840, 842 (5th Cir.2005);
 
 see also Usé v. Usé,
 
 94-0972, p. 4 n. 2 (La.App. 1st Cir.4/7/95), 654 So.2d 1355, 1359 n. 2,
 
 writs denied,
 
 95-1834, 95-1879 (La.11/13/95), 662 So.2d 468. The plaintiff must demonstrate: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the plaintiff sustained injury, and (4) that a causal connection exists between the defendant’s conduct and plaintiffs Isinjury.
 
 In re Cooper/T. Smith v. Gnots-Reserve, Inc.,
 
 929 F.2d 1073, 1077 (5th Cir.1991),
 
 cert. denied,
 
 502 U.S. 865, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991).
 

 
 *234
 
 Determination of the tortfea-sor’s duty and its parameters is a function of the court. The determination of whether a defendant owes a duty to "the plaintiff depends on a variety of factors, including most notably the foreseeability of the harm suffered by the complaining party.
 
 Consolidated Aluminum Corporation v. C.F. Bean Corporation,
 
 833 F.2d 65, 67 (5th Cir.1988),
 
 cert. denied,
 
 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). A harm is a foreseeable consequence of an act or omission if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention.
 
 Consolidated Aluminum Coloration,
 
 833 F.2d at 68.
 

 In the instant case, Dunaway asserts that the defendants contracted with McDonald Construction Company to bring a bulldozer on to the defendants’ property to clear a pathway. In clearing the path, the bulldozer traversed the Brushy Branch Slough, which crosses the defendants’ property and drains into the Pearl River Navigational Canal at the site where the sandbar formed. Dunaway asserts that the bulldozer pushed sand and debris into the slough and removed topsoil adjacent to the slough, and that this work performed by the defendants on their property caused or contributed to the formation of the sandbar upon which Dunaway’s pleasure boat ran aground.
 

 In support of their motion for summary judgment, the defendants submitted several depositions to point out that Dunaway was unable to establish that the bulldozing work performed on defendants’ property caused or contributed to the formation of the sandbar and was also unable to establish that the resulting harm was foreseeable. Mass Calvin Polk, an employee of McDonald Construction Company who operated the bulldozer on the defendants’ property, stated that he | nbrought the bulldozer on to the property to clear a pathway from north to south and in doing so knocked down some bushes; however, he stated that he did not cut or disturb soil. Additionally, Polk stated that where he cleared the path was approximately 1500 to 2000 feet west of the Pearl River Navigational Canal and that he could not see the canal from where he was working. Further, he stated that he did not know the slough emptied into the canal and did not know about the presence of the sandbar.
 

 Additionally, the defendants presented the deposition testimony of Thomas Brown, a wetlands consultant hired by Deborah Hogan. Brown stated that he was on the defendants’ property for approximately thirty to forty-five days in the spring of 1998. Brown stated that he walked on the path cleared by the bulldozer after it was done and that the path crossed the Brushy Branch Slough, which drains into the canal. According to Brown, there were some branches or logs in the slough just so that the bulldozer could cross the slough, but that there was no evidence that the bulldozer had pushed dirt or sand into the slough. Additionally, Brown observed that there were some bushes that had been knocked down to clear the path, but the soil had not been disturbed. According to Brown, he went on to the defendants’ property with a representative of the U.S. Army Corps of Engineers to investigate complaints received by the Corps in March of 1998 from adjoining landowners about the bulldozing work. According to Brown, they observed no redistribution of soil, because if they had, the Corps would have issued a wetlands violation.
 

 
 *235
 
 Additionally, Brown stated that he was aware of the sandbar and had noticed it every day that he was on the defendants’ property, since he accessed the property via boat. According to Brown, parts of the sandbar were visible above the water and had vegetation growing on them. Brown stated that it was obvious that the sandbar began at the mouth of the slough and it extended one-half to three-quarters | ]0of the width of the canal. However, he did not think that the bulldozing work performed on defendants’ property caused the sandbar.
 

 Further, Brown stated that he did not recall mentioning the sandbar to Deborah Hogan, but that she knew of the sandbar eventually because people were calling and saying she was causing the sandbar to be built. However, he was unsure as to whether it was during the thirty to forty-five day period that he worked out on the defendants’ property or after, or whether it was before or after Dunaway’s allision.
 

 Deborah Hogan stated in her deposition that the bulldozer work was performed on her property on February 7, 1998. According to her testimony, when the bulldozer got to the bank of the slough, it put its bucket down and scraped the top of the soil about three times and pushed some leaves, topsoil, branches, and brush in the bottom of the slough and then packed it down with the bucket and crossed the slough. As to her knowledge of the sandbar, she stated that from 1988 until the time of Dunaway’s accident, she and her family had gone on the canal nearly every weekend during the summer and that she never saw a sandbar in the canal. Deborah Hogan stated that she did not know of the sandbar until after Dunaway’s accident.
 

 The defendants also presented the deposition testimony of Michael McGoey, whose pleasure boat had also run aground on the sandbar. McGoey stated he was not sure of the exact date of his accident, but he thought it was in the spring of 1997. McGoey stated he was going down the middle of the canal, and the sandbar extended across sixty to seventy percent of the canal and was four to six inches below the water.
 

 Finally, the defendants submitted the deposition testimony of Richard Single-tary, a deputy with the St. Tammany Parish Sheriffs Office. Deputy Singletary stated that he patrolled the canal regularly and was aware of the sandbar Information where the slough drains into the canal. In fact, Deputy Singletary placed a submerged object sign on the sandbar in October of 1997 and placed yellow caution tape on the sandbar in April 14, 1998, due to the potential hazard that the sandbar posed; however, both the sign and the tape were removed by an unknown person immediately after their placement. Deputy Singletary also stated that after Duna-way’s accident, he estimated that the sandbar was roughly six inches to one foot below the surface of the water.
 

 In opposition to the defendants’ motion for summary judgment, Dunaway submitted the depositions of several individuals who own property adjacent to the defendants’ property. These individuals stated that they went on to the defendants’ land after the bulldozing work and observed that sand, trees, debris, and surface roots had been pushed into the slough. One of the individuals, Kerry Crawford, stated that at the time he went on the property, the sandbar extended into the canal about twenty feet. Another individual, George Stiles, stated that because the bulldozer cut the surface roots, when it rains, there is more erosion of sand into the slough and water washes that additional sand into the canal. All these witnesses stated that the debris and sand from the slough, combined
 
 *236
 
 with the heavy rains, caused growth of the sandbar. Particularly, George Thomas stated that he had never seen the sandbar grow to that extent before.
 

 Additionally, Dunaway presented the deposition testimony of Dr. Joseph Suhayda, an expert in coastal hydrology. Dr. Su-hayda stated that he examined material from the sandbar and material from the bed of the slough and that they were the same sediment. According to Dr. Suhay-da, the bulldozing work directly and indirectly added sediment to the sandbar. Dr. Suhayda estimated approximately 1000 to 1500 cubic feet of material was deposited in the slough for the bulldozer to cross the slough and that the sediment washed or traveled down the creek into the canal and onto the sandbar. Further, when the bulldozer moved Immaterial into the slough, the sediment below was exposed and provided for additional sites for sediment to move into the slough that otherwise would not have been there. Further,
 
 according
 
 to Dr. Suhayda, because of the amount of material deposited into the slough, a type of dam formed, allowing water to build up that, when released, caused a greater velocity flow, increasing erosion of the banks.
 

 According to Dr. Suhayda, considering the above factors, he estimated that at a minimum, the bulldozing work on defendants’ property caused the sandbar to increase in height between six inches and one foot. Further, he opined that the additional material from the bulldozing work contributed to the eastward migration of the sandbar, depositing more toward the center of the channel or to the east of the center, rather than on the west bank where it was already fairly shallow. According to Dr. Suhayda, the material would have contributed to areas that were relatively lower in elevation, i.e. deeper.
 

 Dunaway also submitted the deposition testimony of Robert Frost, a surveying and mapping consultant. Frost examined aerial photographs of the Pearl River Navigational Canal over a large period of time. According to Frost, there was relatively slow accrual of sediment on the sandbar. However, between 1997 and 1998, there was much more rapid development. The sandbar grew from extending one-third of the way into the canal in January 1997 to almost completely blocking the canal in January 1998. In his opinion, the rapid growth was consistent with additional sediments being washed into the canal.
 

 Finally, Dunaway submitted an affidavit signed by Deborah Hogan, executed on December 11, 2007, wherein she stated that the bulldozing work was performed on the Monday before Mardi Gras 1998, or February 23, 1998. This affidavit conflicts with her prior deposition testimony, wherein she stated emphatically that the work was performed on February 7, 1998.
 

 11:>From our review of the record, we find that there are genuine issues of material fact that preclude the granting of summary judgment in favor of the defendants. The evidence establishes that the Brushy Branch Slough runs through defendants’ property and drains into the Pearl River Navigational Canal. The defendants contracted with McDonald Construction Company to clear a pathway on their property, which crossed the slough. However, while both pai’ties agree that the sandbar preexisted the bulldozing work, the evidence presented is contradictory as to the effect the bulldozing had on the slough and the formation of the sandbar at the point where the slough entered the canal. Additionally, while Deborah Hogan stated that she was not aware of the sandbar, she admitted to traveling the canal nearly every weekend during the summers. Further, Thomas Brown acknowledged that Deborah Hogan knew of the sandbar at some point because people were calling
 
 *237
 
 and complaining that she was causing the sandbar to be built. Brown also stated that the Corps received complaints about the work on the property in March of 1998, approximately one month prior to Duna-way’s accident.
 

 Factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion, and all doubt must be resolved in the opponents favor,
 
 Willis v. Medders,
 
 00-2507, p. 2 (La.12/8/00), 775 So.2d 1049, 1050. Further, knowledge and foreseeability necessarily involve factual determinations, and based on the conflicting evidence in the record, we find that reasonable minds could differ as to whether the bulldozing work performed on the defendants’ property contributed to the formation of the sandbar and caused Dunaway’s injuries, and whether the resulting harm was foreseeable to the defendants. Accordingly, we find that the trial court erred in granting summary judgment in favor of the defendants and in dismissing Dunaway’s claims.
 

 ^CONCLUSION
 

 For the foregoing reasons, we reverse the judgment of the trial court and remand this matter for further proceedings consistent with this opinion. All costs of this appeal are to be borne by the defendants, Secret Cove, LLC, Essex Insurance Company, Deborah Hogan, and Robert Hogan.
 

 REVERSED AND REMANDED.
 

 GAIDRY, J., concurs in the result.
 

 [1]
 

 . Dunaway also named as defendants the Louisiana Wildlife and Fisheries Commission; the United States of America, Rodney "Jack” Strain, Sheriff of St. Tammany Parish; the Louisiana Department of Wildlife and Fisheries; Cypress Haven, LLC; McDonald Con
 
 *231
 
 struction, Inc.; and Admiral Insurance Company. All claims against these defendants, however, have been dismissed.
 

 [2]
 

 . Additionally, we note that the fact that a sandbar obstructed approximately three quarters of the width of the canal does not render the canal non-navigable. A water body does not have to be navigable at all times.
 
 See Olin Gas Transmission Corporation v. Harrison,
 
 132 So.2d 721, 728 (La.App. 1st Cir. 1961) (finding that navigability is not destroyed because a water course is interrupted by occasional natural obstructions, nor does the mere fact of the presence of sandbars causing impediments to navigation establish the character of a river as non-navigable);
 
 see also Sanders v. Placid Oil Company,
 
 861 F,2d 1374, 1377 (5th Cir. 1988) (finding that the fact that during certain seasons the access to
 
 *233
 
 Catahoula Lake via the Little River is non-navigable is not determinative of federal admiralty jurisdiction.)