JOHNSON, J.
11 Defendants/Appellants, the State of Louisiana through the Department of Transportation and Development (hereinafter referred to as “DOTD”) and Lester C. Ledet, III, appeal the determination of liability from the 40th Judicial District Court, Division “B,” concerning an allision between a ferryboat and a moored barge whereby Plaintiffs/Appellees, Freddie Po-pulis, Sandra Thomas Bovie, Byron Thomas, Mary Lou Boudoin, and Mary Mitchell, were passengers of the ferryboat. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
The pertinent facts of this appeal are as follows.
This matter arises from an allision[1] that occurred on March 20, 2013 at approximately 5:45 a.m. While departing from the west bank landing in Edgard, Louisiana, with passengers and cars on board and traveling eastbound across the Mississippi River to the landing in Reserve, Louisiana, the ferryboat M/V NEW ROADS abided with a moored barge attached to a fleet. The starboard stern of the ferry made contact with the starboard bow of the barge. The M/V NEW ROADS was owned by DOTD and operated by Captain Lester C. Ledet, III. Plaintiffs, Freddie Populis, Sandra Thomas Bovie, Byron Thomas, Mary Lou Boudoin, and Mary Mitchell, were among the passengers being transported on the ferry to the opposite bank and sustained injuries as a result of the *978 allision.[2] At the time of the incident, it was dark, cool and windy, and the river stage was at 10.3.
On November 25, 2013, Mr. Populis filed an action against DOTD, Captain Ledet and Allstate Insurance Company[3], alleging fault/negligence for failure to keep a proper lookout, failure to train and supervise employees, failure to properly 12identify the proper clearance of the M/V NEW ROADS ferry, failure to exercise reasonable vigilance, failure to maintain reasonable and proper control of the M/V NEW ROADS ferry, and any and all other acts of negligence and/or fault. In a separate action, Mrs. Bovie, Mr. Thomas, Ms. Boudoin and Ms. Mitchell filed suit on February 24, 2014, against the State of Louisiana, alleging fault/negligence for unseaworthiness due to the incompetence of the vessel’s crew to safely operate the vessel on its voyage; the vessel failed to have competent crew keeping lookout and properly stationed and attentive to them duties; the vessel lacked the navigational capacity to avoid the allision; the vessel failed to have competent crew available to render aid and assistance; and other such unseaworthiness to be revealed through discovery. The petition also alleged fault for negligent failure to alter the vessel’s course to navigate clear of moored barges, failure to keep crew properly stationed to keep proper lookout, and failure to return to shore after the allision and render aid and assistance to passengers. The actions were consolidated by the trial court on April 20, 2015, upon the motion of Defendants.
Plaintiffs filed a Motion for Partial Summary Judgment on October 29, 2015, alleging they were entitled to judgment as a matter of law that Defendants were 100% liable for the damages in the litigation. The trial court denied the motion regarding liability on December 7, 2015.[4] Defendants subsequently filed their own Motion for Summary Judgment on January 15, 2016, seeking the dismissal of all of Plaintiffs’ claims. In their motion, Defendants argued that the actions of Captain Ledet on the day of the allision were discretionary, and they were protected from liability pursuant to La. R.S. 9:2798.1. Defendants’ motion was heard on February 26, 2016 and denied by the trial court on March 8, 2016.
The matter proceeded to trial on August 9, 2016. At the conclusion of |sPlaintiffs’ case-in-chief, Defendants orally moved for an involuntary dismissal of Plaintiffs’ claims on the basis that Plaintiffs failed to prove fault or negligence on the part of Captain Ledet or DOTD. Defendants also orally re-urged their Motion for Summary Judgment, contending they were entitled to discretionary immunity. Both of Defendants’ motions were denied, and the trial resumed with Defendants’ presentation of evidence. After the evidence from both sides was presented, the trial court took the matter under advisement.
On August 22, 2016, the trial court rendered its judgment that incorporated reasons. The trial court found that Captain *979 Ledet was negligent and his negligence caused the allision between the ferry and the barge. The trial court awarded $23,748.57 to Mr. Populis; $18,525 to Mr. Thomas; $19,363 to Mrs. Bovie; $19,787.31 to Ms. Boudoin; and $18,869.33 to Ms. Mitchell in damages. The trial court also ordered DOTD to pay legal interest and all court costs. Defendants filed the instant appeal from that judgment.
ASSIGNMENTS OF ERROR
On appeal, Defendants allege: 1) the trial court erred in denying DOTD’s Motion for Summary Judgment on the issue of whether DOTD and Captain Ledet were protected from liability through operation of La. R.S. 9:2798.1; 2) the trial court abused its discretion in denying its Motion for Directed Verdict;[5] and 3) the trial court abused its discretion in apportioning liability to them.
LAW AND ANALYSIS
Denial of Motion for Summary Judgment
Defendants allege the trial court erred in denying their Motion for Summary Judgment on the issue of whether they were protected from liability through discretionary immunity, pursuant to La. R.S. 9:2798.1. They state that Captain I «Ledet operated the M/V NEW ROADS ferryboat across the Mississippi River as a public endeavor of transportation on behalf of DOTD. Defendants argue there was uncontroverted testimony that Captain Le-det was not bound to conform to specific methods of operating the M/V NEW ROADS for public service to the general public; rather, Captain Ledet was required to use his discretion in interpreting and reacting to weather and sea conditions as he encountered them in the manner he deemed appropriate. As an employee of DOTD, Defendants contend that Captain Ledet is entitled to the immunity from liability provided in La, R.S. 9:2798.1 because he used his sole discretion at all times to navigate the ferryboat and complete his assignment.
Plaintiffs argue the trial court correctly held that Defendants were not entitled to summary judgment on the issue of statutory immunity. Plaintiffs contend the statute at issue does not protect against legal fault or negligent conduct at the operational level but only confers immunity for policy decisions, and Captain Ledet made operational decisions that lead to acts of negligence on the morning of the allision. Plaintiffs maintain that La. R.S. 9:2798.1 was not drafted to shield Defendants from liability/negligent actions at the operational level; thus, Defendants were not entitled to summary judgment.
In Pouncy v. Winn-Dixie La., Inc., 15-189 (La.App. 5 Cir. 10/28/15); 178 So.3d 603, 605, this Court explained the review of the denial or grant of summary judgments by stating:
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine issue of material fact. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action.
A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, *980 and admissions, together with the affidavits, if any, admitted for purposes of the motion for summary judgment, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. A material fact is one that potentially insures or prevents recovery, affects a litigant’s ultimate .success, or determines the ^outcome of the lawsuit. An issue is genuine if it is such that reasonable persons could disagree; if only one conclusion could be reached by reasonable persons, summary judgment is appropriate as there is no need for trial on that issue.
Under La, C.C.P. art 966, the initial burden is on the mover to show that, no genuine issue of material fact exists. If the moving party will not bear the burden of proof at trial, the moving party must only point out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. The nonmoving party must then produce factual support to establish that he will be ' able to satisfy his evidentiary burden of proof at trial. If the nonmoving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted.
Appellate courts review a judgment granting or denying a motion for summary judgment de novo. Thus, appellate courts ask the same questions the trial court does in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law.
(Internal citations omitted).
An interlocutory judgment, such as the denial of a summary judgment, may be considered upon review of the final judgment. Elliot v. Holmes, 15-296 (La.App. 5 Cir. 11/19/15); 179 So.3d 831, 834 n. 3.
In this matter, the trial' court reviewed whether Defendants were entitled to summary judgment and a finding that they could not be liable for the allision pursuant to La. R.S.9:2798.1. La. R.S.9:2798.1 provides, in pertinent part:
A. As used in this Section, “public entity” means and includes the state and' any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumen- . talities, officers, officials, and employees of such political subdivisions. ■
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the .legitimate governmental objective for which the policymaking or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant .misconduct.
In Banks v. Parish of Jefferson, 12-215 (La.App. 5 Cir. 1/30/13); 108 So.3d 1208, 1214, writ denied, 14-79 (La. 3/14/14); 135 So.3d 605, this Court, citing Johnson v. Orleans Parish Sch. Bd., 06-1223 (La.App. 4 Cir. 1/30/08); 975 So.2d 698, 709-10, stated, the following regarding the application of discretionary immunity:
*981 The Louisiana Supreme .Court established a two-step test for courts to follow when determining whether the immunity applies. A court must first determine whether a statute, regulation, or policy requires the governmental agency to follow a particular course of action. If there is such a requirement, then there is no choice or discretion, and the immunity does not apply. If, however, the governmental entity has a choice about whether to undertake the activity, then the entity will be protected by the immunity only if the choice is-grounded in “social, economic, or political policy.” The application of this affirmative defense is “a question of fact to be determined through a trial.” Once a defendant establishes its conduct involves a matter of choice or diseretion[,] that is not the end of the inquiry. A court must also consider whether the conduct in question occurred at the “operational level”, or how the entity carried out its policy or decision. The immunity statute does not protect governmental entities against legal fault or, negligent conduct at the “operational level”, but only confers immunity for policy decisions, that is decisions based on social, economic, or political concerns. As such, once a discretionary decision is made, the government entity is not protected from liability for conduct in carrying out the discretionary decision.
(Internal citations omitted).
In their written Motion for Summary . Judgment, Defendants sought to have a judgment rendered that stated Captain Ledet and DOTD could not be held liable for the allision because they were protected by discretionary immunity. They argued that the barge was unlit; the captain of a vessel determines how to handle the vessel and where to go; there was no directive applicable to the performance of the duties of the master of the vessel; and, there was expert testimony affirming Captain Ledet was not negligent in his actions at-the time.of the incident. In essence, Defendants sought to have the trial court determine whether the application of discretionary immunity should apply to this matter through summary judgment. However, as cited above, the “application of this affirmative defense is ‘a question of fact to, be determined through a trial.’ ” See, Banks, supra.
| Jn their oral Motion for Summary Judgment raised at the end of Plaintiffs’ case-in-chief, Defendants again sought to have a judgment rendered stating Captain Ledet and DOTD could not be held liable for the allision under discretionary immunity. The trial court again , denied .the motion. A motion for summary judgment is a procedural device used to avoid a full-scale trial. Bouncy, supra. However, Defendants raised their oral motion in-the midst, of their full-scale trial, which contradicted the procedural purpose of the motion for summary judgment. Additionally, the application of their affirmative' defense was a question of fact that needed to be determined by a factfinder. See, Banks, supra.
Therefore, upon de novo review, we find that summary judgment was not appropriate in determining whether Captain Ledet and DOTD were entitled to discretionary immunity that would shield them from liability for the allision. There were remaining genuine issues of material fact on that issue. A trial on the merits was necessary to determine the applicability of the discretionary immunity defense toCaptain. Le-det’s actions at the time of the incident. Therefore, we find that the trial court did not err in denying Defendants’ Motions for Summary Judgment.
Denial of Motion for Involuntary Dismissal
Defendants allege the trial court erred in denying their Motion for Involun *982 tary Dismissal because Plaintiffs failed to carry their burden of proving their case-in-chief on the issue of liability. Defendants claim that Plaintiffs provided no testimony or other evidentiary proof that Captain Ledet’s actions in piloting the ferryboat at the time of the incident were unreasonable or in any manner a violation of normal maritime standards for safety in operation of a vessel. As such, Defendants contend they were entitled to an involuntary dismissal of Plaintiffs’ claims at the conclusion of Plaintiffs’ presentation of evidence.
Plaintiffs argue the trial court properly denied Defendants’ Motion for ^Involuntary Dismissal because they proved Defendants’ negligence by a preponderance of the evidence during their case-in-chief. Plaintiffs maintain they proved Defendants had a duty to safely operate the M/V NEW ROADS; Defendants breached their duty by causing the allision; Plaintiffs suffered damages; and, their damages were a direct result of the allision.
In a motion for involuntary dismissal, the defendant may move for a dismissal of the action against him after the close of the plaintiffs case. Machado v. Baker Concrete Constr., 13-273 (La.App. 5 Cir. 10/30/13); 128 So.3d 477, 481, citing Brock v. Singleton, 10-550 (La.App. 5 Cir. 3/29/11); 65 So.2d 649, 600. The appropriate standard in determining whether an involuntary dismissal should be granted is whether the plaintiff has presented sufficient evidence in his case-in-chief to establish his claim by a preponderance of the evidence.[6] Id. An appellate court may not reverse a ruling on a motion for involuntary dismissal unless it is manifestly erroneous or clearly wrong. Id.
In this matter, the allision occurred in a navigable waterway (the Mississippi River) between a vessel (the M/V NEW ROADS) and a moored barge. Thus, we must evaluate whether Plaintiffs presented sufficient evidence by a preponderance of the evidence on their maritime law claims.
As a general rule, the state court applies the maritime or admiralty law to a case involving the injury of a passenger on a vessel, whether or not the petition designates it as such. Day v. Touchard, Inc., 97-1180 (La.App. 5 Cir. 5/27/98); 712 So.2d 1072, 1076, citing Green v. Industrial Helicopters, Inc., 593 So.2d 634, 637 (La. 1992). The elements of a maritime negligence cause of action are essentially the same as land-based negligence. Dunaway v. La. Wildlife & Fisheries Comm’n, 08-1494 (La.App. 1 Cir. 2/13/09); 6 So.3d 228, 233, citing Withhart v. Otto Candies, L.L.C., 431 F.3d 840, 842 (5th Cir. 2005). Under the general maritime law, the plaintiff must demonstrate that there was a duty owed by the defendant, breach of that duty, injury sustained by the plaintiff, and a causal connection between the defendant’s conduct and the plaintiffs injury. Dean v. Ramos Corp., 00-1621 (La.App. 5 Cir. 2/28/01); 781 So.2d 796, 802, citing In re: Cooper/T. Smith, 929 F.2d 1073, 1077 (5th Cir. 1991), cert. den., 502 U.S. 865, 112 act 190, 116 L.Ed.2d 151 (1991). Furthermore, the resultant harm must be reasonably foreseeable. Id. “These standards are not remarkably different from state standards, except the state law would apply a ‘duty/risk’ analysis, rather than a ‘reasonably foreseeable’ analysis.” Id., citing Use v. Use, 94-972 (La. App. 1 Cir. 4/7/95); 654 So.2d 1355, 1359 n. 2.
*983 Federal maritime Inland Navigational Rule 5 denotes that a vessel has a duty to “maintain proper look-out by sight and hearing, as well as by all available means in the prevailing circumstances so as to make a full appraisal of the situation and of the risk of collision.” Wynne v. Trotter, 10-90 (La. App. 4 Cir. 6/30/10); 46 So.3d 678, 682, citing 33 CFR 83.05. The pilot of a vessel has a duty to navigate the vessel with proper lookout at a safe speed. Id. In regards to causation, it has been held that when a moving vessel allides with a stationary object, the former is presumed at fault. Id., citing The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895); Dow Chemical Company v. Dixie Carriers, Inc., 463 F.2d 120, 122 n. 4 (5th Cir. 1972).
During the presentation of Plaintiffs’ evidence, each plaintiff testified to his or her recount of the allision and the injuries sustained from it. When recalling the allision, Mr. Thomas testified that it was dark that morning, and the weather was cool with a little wind. He stated that the ferry was drifting backwards before it hit the moored barge, and the ferry hit the barge two times, particularly hard the second time. He further testified that he was in his car, and the deckhands on duty | inwere not on the deck at the time of the incident. Mr. Thomas said the fleet of moored barges had been parked on that tier for years prior to the allision. He also stated that a ship passed on the right side of the ferry after the allision occurred.
Mrs. Bovie testified there was nothing unusual about the weather on the morning of the allision. She stated that she initially did not know what the ferry hit at the time of the incident because she did not get out of her car. She also stated that the impact of the ferry hitting the barge was hard. Mrs. Bovie further stated that the ferry proceeded to cross to the east bank of the Mississippi River after the incident.
Ms. Boudoin testified that the weather was clear on the morning of the incident, and nothing was out of the ordinary that day. She stated that she was in her car and did not see what happened, but she felt two hard hits with the second, hit being very hard.
Ms. Mitchell testified there was no current out of the norm on the morning of the incident. She stated that she was seated in her car and was able to see the ferry hit the barge because of the way her car was positioned on the ferry. She knew that the ferry did not use lights, but she could not see whether the barge had its lights on. She stated that as the captain backed up the ferry to cross the river, it hit the barge. She further stated that the captain picked up a little speed and hit the barge again. She described the second hit as a hard hit. Ms. Mitchell said the ferry crossed the river after the ship passed.
Mr. Populis testified that he was seated in his car at the time of the allision. He recalled that the ferry drifted downriver about 200 yards after leaving the dock. After a couple of minutes, he heard a booming sound, like steel hitting steel. He felt the ferry strike the barge two times. Mr. Populis stated that he was aware of where the moored barge was located because it was always in the same spot. He stated that he was surprised that the ferry crossed the river to the east bank because | uhe thought the ferry would go back to the west bank dock after the allision.
In addition to their live testimonies, Plaintiffs also presented the testimony of Captain Ledet. Captain Ledet testified that he was the only person in the wheelhouse at the time of the allision, and he accepted responsibility for the allision because he was the person responsible for the vessel, the MTV NEW ROADS. He *984 agreed with the notions that a captain must keep a constant lookout around his vessel at all times, and'it would be reckless for. a captain to not keep a proper lookout around that vessel.
Captain- Ledet recounted his version of the events occurring on the morning of the allision. He corroborated Plaintiffs’ testimonies that the morning was dark but clear on the day of the incident. He stated that there were strong winds that morning and the currents were higher than normal; however, those were not reasons to delay sailing -the ferry across the river. He further stated that his crew members, which consisted of two deckhands and two engineers, were performing their jobs at the time of the allision, but he did not recall whether any members were on the deck.
Captain Ledet testified that his first trip of that morning was from the east bank landing to the west bank landing, and there were no incidents during that trip. Prior to departing from the west bank landing back to the east bank landing, he stated that he performed his ritual of looking for lights and anything approaching the ferry, listening to the VHF radio[7] for traffic, and checking his radar. While performing his ritual, Captain Ledet said that he noticed the lights of a bigger, oncoming vessel and contacted the pilot of that vessel via the VHF radio. The two made an agreement that the bigger vessel would pass ahead of the' ferry. Captain Ledet estimated that the other vessel was about 15 minutes away from the west bank landing. He stated that he signaled the deckhands to secure the ferry’s gates | 18and untie the ferry from the landing about 10 minutes after communicating with the other vessel’s pilot.
Because the east bank landing was a downriver, diagonal crossing from the west bank landing, Captain Ledet testified that he proceeded to put the ferry in reverse in order to back off of the ferry landing and place the ferry into a hole configured between the moored barges to start heading southeastward. He stated that the moored barges were approximately 300 yards from the west bank landing. He further stated that he always used that hole between the barges for his trips. As he was moving the ferry forward from the hole, Captain Le-det said that a strong wind hit the broadside of the ferry and pushed it toward barges that he could not see. He asserted that he did not see those barges because they were unlit and had been unlit prior to March 20, 2013. Although Captain Ledet stated that there had been moored barges in that area prior to the allision, he testified that the barges were never in the same configuration. He continued south/southeast after the ferry’s starboard aft bounced off of the bow of the barge. Captain Ledet maintained that he was always in control of the ferry; however, he believed that the cause of the allision was “mother nature with the- high winds and the current.”
Captain Ledet later agreed that, as a professional, he was skilled to handle the conditions that were present on the day of the allision. .When questioned why he chose not to use the ferry’s spotlight to illuminate the alleged unlit, moored barges he knew were in the area,. Captain Ledet replied there was no need to use the spotlight. He also admitted that he could have deployed crew members to help, but he chose not to use them.
Plaintiffs also presented the deposition testimony of Bill Harding, the gulf fleets *985 manager for Cargo Carriers.[8] Mr. Harding testified that the barges had been permanently fixed to that area for approximately 20 years. He stated that the 11sprocess with the company’s fleet is to light the barges prior to sunset and pick up the lights after sunrise and document those times on a vessel log. Mr. Harding confirmed the logs for March 19 and 20, 2013 reflected that the lower portion of the fleet in question was lit. However, he later admitted that he did not have personal knowledge of the lighting on that fleet.
After reviewing the above-mentioned evidence, we find that Plaintiffs presented sufficient evidence in their case-in-chief to establish their maritime claims by a preponderance of the evidence. Therefore, we find the trial court was not manifestly erroneous or clearly wrong in its denial of Defendants’ Motion for Involuntary Dismissal.
Finding of Liability
Defendants allege the trial court erred by casting them in any liability for the allision. Defendants argue the trial court’s judgment is flawed because none of the reasons asserted were supported by the evidence presented at trial. Defendants again contend that Plaintiffs failed to carry their burden of proving any fault or negligence on the part of Captain Ledet or DOTD, and testimony was presented that the barge in question was not lit at the time of the incident. Defendants also contend that Bill Warner, Plaintiffs’ only witness who testified that the barge was lit, had no direct knowledge whether the barge was actually lit prior to the incident. They further argue that Captain Ledet’s actions were reasonable and in compliance with the normal practices of the maritime industry at all times.
Conversely, Plaintiffs argue the trial court did not err in finding fault or negligence on the part of Defendants because they met their burden of proof. Plaintiffs aver that ample evidence of the reckless and unnecessary behavior of Captain Le-det was provided in live and deposition testimony. Plaintiffs contend the trial court correctly acknowledged that Captain Le-det was responsible for keeping a lookout for the MW NEW ROADS; yet, he did not see the barges in |14question and neglected to ask the crew to help him keep a proper lookout for those barges or use the floodlight. When weighing the credibility of the witnesses and other evidence presented, Plaintiffs further aver the trial court properly weighed the evidence and found Defendants were at fault for the allision.
As previously mentioned, under the general maritime law, the plaintiff must demonstrate that there was a duty owed by the defendant, breach of that duty, injury sustained by the plaintiff, and a causal connection between the defendant’s conduct and the plaintiffs injury. Dean, supra. Furthermore, the resultant harm must be reasonably foreseeable. Id. A vessel has a duty to “maintain proper lookout by sight and hearing, as well as by all available means in the prevailing circumstances so as to make a full appraisal of the situation and of the risk of collision.” Wynne, supra. The pilot of a vessel has a duty to navigate the vessel with proper lookout at a safe speed. Id. In regards to causation, it has been held that when a moving vessel al-fides with a stationary object, the former is presumed at fault. Id.
State courts are directed by the Louisiana Supreme Court to apply Louisiana’s manifest error standard of review in general maritime and Jones Act cases. *986 Voiron v. Kostmayer Constr. Co., 03-607 (La.App. 5 Cir. 10/28/03); 860 So.2d 131, 133, citing Milstead v. Diamond, M Offshore, Inc., 96-2446 (La. 7/2/96); 676 So.2d 89. Under the manifest error standard of review, in order to reverse a factual determination, an appellate court must find 1) a reasonable factual basis does not exist in the record for the finding, and 2) the record establishes that the finding is clearly wrong or manifestly erroneous. Id.
In this matter, the trial court found Captain Ledet was negligent, and his negligence caused the allision between the ferry and the barge. The trial court further found:
Expert testimony aside, common sense dictates that darkness 11fiand familiarity with the unlit barge fleet required simple, reasonable precautions to be taken by the captain, upon whom the safety of the passengers was dependent. Considering these familiar conditions, as well as the weather and current, and the instruments and equipment available to him, it was foreseeable that an allision would occur. As captain of the ferry, Captain Ledet owed a duty to his passengers and he breached that duty. As a result of his breach of duty, the allision occurred and passengers were injured.
At trial, Plaintiffs presented evidence that the M/V NEW ROADS allided with moored barges. It was established through Captain Ledet’s testimony that a captain must keep a constant lookout around his vessel at all times, and it would be reckless for a captain to not keep a proper lookout around that vessel. Plaintiffs also presented evidence that Captain Ledet knew of the location of the barges, contended the barges were always unlit, and still chose not to take the precautions of using the ferry’s spotlight or his crew to aid in navigating the ferry,on that dark morning.
In their defense, Defendants presented the testimonies and depositions of crew members and a passenger, Jahmal Wilson, who all attested that the barges were not lit on the day of the allision. Defendants also presented the deposition testimony of Captain Larry Strouse, a marine appraiser, a marine surveyor, and a licensed captain with an unlimited master’s license. He stated that the configuration of the barges was probably different every day because barges are continuously shifted in and out of the configuration. He further stated that the barges were difficult to see during the dark hours because they were painted black. Captain Strouse also testified that ferryboats are not supposed to use spotlights for navigational purposes; but, he later stated that he did not know the use for the spotlight on the ferry. Captain Strouse opined there was no negligence or fault on the part of Captain Ledet because he could not see the barge. He also opined that the MTV NEW ROADS was never out of control but was influenced by the wind and current. Captain Strouse later agreed that a vessel captain should be more Incautious when proceeding in dark conditions near a fleet of permanently moored barges.
After review, we find there is a reasonable, factual basis in the record for the trial court’s determination that Captain Ledet was negligent in his actions. Evidence was presented that Captain Ledet had the duty to keep a proper lookout and make a full appraisal of the situation, and he breached that duty by opting not to use available precautions when navigating the ferry in the dark near known moored barges and alliding with one of the barges. Plaintiffs also testified regarding their injuries sustained from the allision and presented corroborating medical evidence. Additionally, evidence was presented that there was a causal connection between Captain Ledet’s breach of his duty, which *987 caused the allision, and Plaintiffs’ injuries. Therefore, after review of the trial court’s determination under the manifest error standard, we cannot find that the trial court was erroneous in finding Captain Ledet liable for the allision.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Defendants, the State of Louisiana through the Department of Transportation and Development and Lester C. Ledet, III, are assessed the costs of this appeal.
AFFIRMED

. Black’s Law Dictionary 75 (7th ed. 1999), defines allision as "[t]he sudden impact of a vessel with a stationary object, such as an anchored vessel or a pier.”

. Robin Wilson, Jahmal A. Wilson and Pamela Lewis were also passengers on the M/V NEW ROADS; however, they are not parties to the instant action.

. Allstate Insurance Company was later dismissed from the action with prejudice.

. The designated record in this matter does not contain a written judgment on the motion for partial summary judgment or a transcript of the motion hearing. The minute entry states, "MOTION FOR SUMMARY JUDGMENT DENIED ON LIABILITY AND FINDS THAT THE CAPTAIN WAS 100 PERCENT AT FAULT.” The true intent of the trial court's ruling is indiscernible from the minute entry alone.

. Although Defendants correctly moved for involuntary dismissal pursuant to La. C.C.P. art. 1672(B), which is applicable to cases tried in a bench trial, they incorrectly argue on appeal the law regarding directed verdicts (La. C.C.P. art. 1810), which is applicable to cases tried by a jury. Because this matter was tried in a bench trial, we will address the denial of the Motion for Involuntary Dismissal.

. Proof by preponderance of the evidence has been defined to mean "evidence, taken as whole, shows that fact or cause shown to be proven is more probable than not." State v. One 1991 Pontiac Trans Sport Van, 98-64 (La. App. 5 Cir. 7/9/98); 716 So.2d 446, 449, citing Crowell v. City of Alexandria Through Snyder, 558 So.2d 216 (La. 1990).

. Captain Ledet explained that a VHF radio is a marine radio used to broadcast between vessels in the area.

. Cargo Carriers is the owner of the tier where the moored barges were located.